**In re JOHN DOE CORPORATION.**

**JOHN DOE CORPORATION, Appellant,**

**v.**

**UNITED STATES of America, Appellee.**

**No. 872, Docket 82–6006.**

United States Court of Appeals,
Second Circuit.

Argued Feb. 11, 1982.
Decided March 23, 1982.

Peter K. Bleakley, Washington, D. C. (William J. Baer, Robert N. Werner, Arnold & Porter, Washington, D. C., on the brief), for appellant, John Doe Corp.

James D. Harmon, Jr., Asst. Attorney-in-Charge, U. S. Dept. of Justice, Organized Crime Strike Force, E. D. N. Y., Brooklyn, N. Y. (Edward R. Korman, U. S. Atty., Thomas P. Puccio, Attorney-in-Charge, U. S. Dept. of Justice, Organized Crime Strike Force, E. D. N. Y., Brooklyn, N. Y., on the brief), for appellee, United States of America.

Before TIMBERS, NEWMAN and WINTER, Circuit Judges.

RALPH K. WINTER, Jr., Circuit Judge:

The "John Doe Corporation"[1] appeals from a civil contempt judgment entered against it by Judge Sifton in the Eastern District of New York because of its failure to produce certain documents and to make available an employee for testimony before a grand jury. Doe Corp. has refused to comply in order to test on appeal its claims that the documents and testimony are protected by the attorney-client privilege and work-product immunity. We affirm.

---

1. This appeal involves proceedings currently before a grand jury. There has been no indictment. Argument and testimony in the District Court occurred in a closed courtroom. We granted a motion to put the record and briefs on appeal under seal. We denied a motion to hold argument *in camera* but cautioned counsel about preserving anonymity at this early and sensitive stage of the proceedings. In that spirit, this opinion will utilize pseudonyms in describing the corporation and individuals involved.

## THE GRAND JURY AND DISTRICT COURT PROCEEDINGS

The sequence of factual development is of importance to our ruling and a description of the grand jury and District Court proceedings will substitute for the customary statement of facts.

In or around 1980, a grand jury in the Eastern District focused its investigation on Doe Corp.'s retaining of a politically active lawyer holding elective office ("Lawyer") in connection with a controversy over Doe Corp.'s liability to a governmental body. The investigation largely concerned $96,500 paid in 1977 to Lawyer ostensibly as a legal fee but which may have been a means of bribing or attempting to bribe one or more administrative officials in a position to settle the controversy favorably to Doe Corp.

Doe Corp. had, during relevant periods, conducted an investigation of its business practices, culminating in a report entitled the Business Ethics Review ("BER"). That study entailed preparation by Doe Corp.'s legal department of a detailed questionnaire which was filled out by 338 employees. Follow-up interviews of selected employees were conducted by members of the legal department who kept notes of the interviews.

In the course of its investigation, the grand jury issued a subpoena to Doe Corp. for

all business ethics reviews for activities during the years 1977 and 1978, including all memoranda, notes and correspondence relating thereto.

It also issued subpoenas to the accounting firm which conducted the annual audit of Doe Corp. for all records relating to such audits during the relevant period.

Doe Corp. responded with a motion to quash based on claims of attorney-client privilege and work-product immunity, supported by affidavits tracking the language of the Supreme Court's decision in *Upjohn Co. v. United States*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981).[2] The accounting

---

2. Appellant's Brief states, at pp. 4–6:

The origins of the Business Ethics Review date to November 1976, when the Securities and Exchange Commission (the "SEC") asked [Doe Corp.] to conduct an investigation of all the questionable practices to which [Doe Corp.] may have been a party since January 1, 1969. After a preliminary legal review of the matters raised by the SEC, [Doe Corp.'s] Board of Directors, acting on the recommendation of its Audit Committee, directed the Legal Department to conduct a confidential company-wide legal study and investigation of the Company's business practices. This investigation was the equivalent of the questionable payments inquiries conducted by over 500 other corporations during this time period. Its purpose was to provide a factual foundation which would enable the Legal Department to render legal advice about [Doe Corp.'s] exposure to liability in potential litigation and about policies and internal controls to ensure compliance with applicable laws and regulations. [Doe Corp.] intended the investigation to be confidential. All documents and information generated were to be subject to the attorney-client and work-product privileges....

Over the ensuing months, [Doe Corp.'s] Legal Department, with the assistance of the law firm of Arnold & Porter and [Doe Corp.'s] outside auditors, [an] independent accounting firm ... undertook a wide-ranging investigation. A detailed questionnaire, marked

'Privileged and Confidential,' was prepared for distribution to 338 employees, along with a letter from management reiterating [Doe Corp.'s] policy of strict compliance with all applicable laws and instructing employees to cooperate with the investigation.... A memorandum from the General Counsel, also marked 'Privileged and Confidential,' informed employees to whom the questionnaires were distributed that the attorney-client and work-product privileges covered their responses to the questionnaire....

After analyzing employee responses to the questionnaires, [Doe Corp.'s] lawyers interviewed selected employees. The lawyers advised these employees that the interviews were part of the Business Ethics Review and were privileged and confidential. [A member of Doe Corp.'s Legal Department] prepared notes of the interviews he conducted. It is his sworn testimony that those notes reflect his 'mental impressions of the information provided.' ...

[Doe Corp.'s] lawyers compiled all the information they obtained in the investigation, organized it, analyzed the legal implications, and offered legal advice in a report entitled the Business Ethics Review. [Doe Corp.] regarded the report as privileged and confidential and took steps to preserve its confidentiality. The Legal Department presented its findings to the Board of Directors, which, among other actions, thereafter adopted a

firm made similar claims in its motion to quash.

The government requested an opportunity to present grand jury evidence *in camera* to support its claim that Doe Corp.'s BER dated January 23, 1978, was in furtherance of a course of ongoing criminality. It also argued that a compelling need had been shown for the subpoenaed materials under the work-product doctrine.

In the course of the hearing before Judge Sifton, evidence that Lawyer had been retained in connection with the governmental controversy was introduced. Other counsel previously retained by Doe Corp. gave testimony that indicated some ambiguity, or at least an initial misunderstanding, as to Lawyer's role but assertions of privilege foreclosed development of this point.

It was also disclosed that the BER had been shown to the accounting firm in January, 1978. Appellant argued that this disclosure was part of the firm's participation in the preparation of the BER under the supervision of the legal department and made in confidence for the purpose of obtaining legal advice. See *United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961). There was also testimony, however, that disclosure was in connection with the 1977 audit and was necessary to verify representations by Doe Corp.'s management that no specific disclosures pertaining to matters in the BER were required in the 1977 financial statements. Had the accounting firm not been shown the BER, it would have issued only a qualified opinion on the 1977 statements. That would have been "disastrous" for Doe Corp. since the Securities and Exchange Commission ("SEC") would not accept a qualified opinion were Doe Corp. to attempt to raise capital by a public offering of registered securities.

The BER was also disclosed to a lawyer representing an underwriter ("Underwriter Counsel") in connection with a public offering of Doe Corp.'s securities in 1978. Underwriter Counsel had learned from minutes of Doe Corp.'s director meetings that an ethics review had been performed. He

thereafter "insisted upon having access to the BER in order to complete the exercise of due diligence in connection with the proposed public offering and in order to determine that the Registration Statement and underlying prospectus [filed with the SEC] did not contain an untrue statement of a material fact or omit to state a material fact...." He told Doe Corp.'s General Counsel ("General Counsel") that if the BER was not provided, he would so advise the underwriter which would then consider whether or not to proceed with the public offering.

On February 9, 1978, a member of the accounting firm ("Accountant") approached General Counsel with specific questions about the $96,500 paid to Lawyer. Employees of the accounting firm conducting the continuous audit of Doe Corp. had been unable to substantiate the performance of any services by Lawyer. Accountant brought this to General Counsel's attention, and inquired whether any portion of the fee had been used as a bribe. Accountant made these inquiries as part of the audit and as part of his evaluation of the integrity of the BER in the course of approving the 1977 financial statements. A positive evaluation was a prerequisite to certifying those statements. Without certification, Doe Corp. could not make a public offering of registered securities. No testimony was elicited at this time as to General Counsel's reply because of assertions of attorney-client privilege.

In an opinion dated April 30, 1981, Judge Sifton ordered the production of some documents and granted the motion to quash as to others. He found that Doe Corp. had not met its burden of showing that the attorney-client privilege attached to the documents in issue, principally on the grounds that its submission had been by way of affidavit rather than live witnesses, and it had not produced key documents relating to the privilege claim. April 30, 1981, Op. at, *e.g.*, 18–20. Nevertheless, he upheld the work-product claim and found that the

Code of Business Conduct to guide future

operations of the Company....

government's showing of need was insufficient, although specifically inviting a renewal of the motion if interviews of Doe Corp. employees proved an inadequate vehicle for further investigation.

Judge Sifton suggested that disclosure of the BER to Underwriter Counsel might be a waiver but declined to so hold given the lack of a showing by the government as to the consequences of disclosure. *Id.* at 17. He also declined the government's offer of an *in camera* submission, leaving open the possibility of a renewed offer at a later time. *Id.* at 13–14, 83. Finding that Accountant's conversations with General Counsel concerning the payment to Lawyer was part of the annual audit and, therefore, unprotected by either the attorney-client privilege or work-product immunity, Judge Sifton ordered production of a memorandum prepared by Accountant which described General Counsel's response to his inquiry. *Id.* at 83–84. This memorandum was produced.

On September 28, 1981, the government renewed its motions to compel production of the final BER and all prior drafts, all documents underlying the BER pertaining to five high level Doe Corp. employees (including General Counsel), and all documents pertaining to changes in BER drafts. Four of the five employees designated had declined to testify before the grand jury on Fifth Amendment grounds. The government also produced Accountant's memorandum of the conversation with General Counsel (one of the four declining to give grand jury testimony). According to the memo, General Counsel told Accountant that the payment to Lawyer had been mentioned in an early draft of the BER but that mention had been deleted after he had made a thorough investigation, including conversations with Lawyer, which verified that nothing was irregular, that services had been performed by Lawyer, and that Lawyer had specifically denied the existence of any scheme to bribe public officials.

The government also renewed its offer of an *in camera* submission of testimony and documents before the grand jury in an ef-

fort to show ongoing criminality and the resultant inapplicability of the attorney-client privilege and work-product immunity. It argued that the secrecy of the grand jury proceedings was essential at this stage and that some of the evidence might never be disclosed to third parties. It announced that Doe Corp. was a target of the grand jury investigation.

On October 14, 1981, Judge Sifton ruled that the government had demonstrated a compelling interest justifying an *in camera* examination of submitted grand jury materials.

On December 3, 1981, Judge Sifton ruled that the *in camera* submission and evidence in the record showed a compelling need overcoming the work-product immunity as to portions of the BER referring to the money paid to Lawyer. December 3, 1981, Op. at 17–20, 37. He found the attorney-client privilege waived by the disclosure to Underwriter Counsel. *Id.* at 20–26.

As to documents underlying the BER pertaining to the five high level Doe Corp. employees, he held that the government's showing of cause was insufficient as to three of them. *Id.* at 27. He found it sufficient, however, as to General Counsel and another employee ("Employee A"). *Id.* at 28. He stated:

> The *in camera* submission provides a basis for believing that the . . . fee [to Lawyer] may have been part of a plan to bribe a [public official] and [Accountant's] memorandum . . . indicating that reference to the . . . fee was deleted from the report, provides a reasonable basis to inquire into whether there was a cover-up concerning the . . . fee.

*Id.* He further held that the government had made a substantial showing that these materials might be "the only source of evidence from which to determine whether federal crimes have been committed." *Id.* at 29. Finally, he held that the attorney-client privilege had been waived by disclosure to Underwriter Counsel "for the purpose of determining whether the absence of reference to the . . . fee constituted an effort to cover up a bribery effort by the corporation." *Id.* at 30.

As to documents pertaining to changes in BER drafts, Judge Sifton ordered production on the grounds applicable to the documents pertaining to Employee A and General Counsel. *Id.* at 32.

Doe Corp. declined to comply with Judge Sifton's order as to the BER's underlying documentation pertaining to Employee A, including handwritten notes made by a member of Doe Corp.'s legal department while interviewing that employee. It also declined to provide portions of notes by that member of the legal department and by General Counsel arguably relating to changes in BER drafts pertaining to the fee to Lawyer. The reason given for the failure to produce was a desire to test on appeal Judge Sifton's rulings. As to other parts of Judge Sifton's order, Doe Corp. informed the court that no such documents are in its possession and the BER contains no reference to the fee to Lawyer. The government moved for a contempt order.

On January 8, 1982, the government offered an affidavit indicating that another Doe Corp. employee ("Employee B") had been immunized and was about to testify before the grand jury. This person had been among the three for whom underlying BER documentation. had been sought but denied by Judge Sifton. In a pre-testimony interview, Employee B had said that he had concluded on the basis of conversations with Employee A that Doe Corp. had decided to bribe a state official in connection with the controversy mentioned above. His lack of recollection, however, precluded inquiry into details. The government broadened its motion to include Employee B's completed BER questionnaire, notes relating to interviews of Employee B and testimony by the member of Doe Corp.'s legal department who had interviewed Employees A and B.

The handwritten notes of the interview of Employee A were submitted *in camera* to Judge Sifton with a view to redacting material reflecting the attorney's mental processes or legal theories. Employee A's completed questionnaire was also submitted *in camera.*

On January 18, 1982, Judge Sifton granted the government's broadened request.[3] He also ruled that the handwritten notes of the interview of Employee A were recitations of statements made by him and contained no explicit disclosures of the attorney's mental processes or legal theories. Jan. 18, 1982, Op. at 2–4. On January 19, 1982, he entered a judgment of contempt for the failure

> to produce a memorandum of an interview given by [Employee A] on October 18, 1977; to produce questionnaire answers and memoranda of interviews of [Employee B] given in 1977 in connection with [Doe Corp.'s BER]; to produce [the member of Doe Corp.'s legal department] to testify to the contents of the interviews covered by those memoranda;• and to produce documents relating or referring to changes in drafts of [the BER] with respect to a legal fee of $96,500 paid to [Lawyer]....

This appeal followed on an expedited basis.

## THE ATTORNEY–CLIENT PRIVILEGE

Although the attorney-client privilege has ancient origins, its applicability and scope in the context of attorneys representing corporate clients appears to be a relatively recent subject of litigation. The only major Supreme Court decision, in fact, was decided last year. *Upjohn Co. v. United States, supra.*

*Upjohn* affirmed the "assumption" that a corporation may assert the privilege on its behalf. 449 U.S. at 390, 101 S.Ct. at 682. It held that the purpose of the privilege is, as it is in the case of individuals, to encourage "full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice" and that "sound legal advice or advocacy serves public ends and . . . depends upon the lawyer being fully informed by the client." *Id.* at 389, 101 S.Ct. at 682.

---

**3.** He did not, however, order production of Employee A's completed BER questionnaire. As to Employee B's questionnaire, he ordered production of the answers only.

The privilege thus affords confidentiality to communications by clients or, in the case of a corporation, their agents to their lawyers in order to foster "full disclosure." *Upjohn* rejected, however, the proposition that the only communications protected are those made by "control group" employees of a corporation. *Id.* at 390–92, 101 S.Ct. at 682–684. Because lawyers must be fully informed of the facts giving rise to a need for legal representation, they must be able to seek information from employees at every level of the corporate entity concerning matters which may entail legal problems for the corporation. Were such communications not protected, or protected only when emanating from the "control group," lawyers would not have sufficient, accurate information to render "sound and informed advice." *Id.* at 390, 101 S.Ct. at 682.

We do not reach the question of whether appellant's proof was sufficient to establish that the attorney-client privilege attached under *Upjohn*. Judge Sifton held that the proof offered by appellant through affidavits was insufficient. Subsequently, General Counsel took the stand but invoked the Fifth Amendment. A subordinate member of the legal department also took the stand and affirmed his affidavit. We do not have the benefit of findings by Judge Sifton as to the weight or credibility of appellant's evidence, and we are not willing to say that the record so strongly supports appellant's position that the District Court would have been obliged to rule in its favor. We need not remand, however, for the judgment can be affirmed even if the privilege attaches under *Upjohn*.

■ The *Upjohn* privilege is clearly limited to communications made to attorneys solely for the purpose of the corporation seeking legal advice and its counsel rendering it. In the present case, *Upjohn* is inapplicable since Doe Corp. waived the privilege and there is probable cause to believe it utilized the BER inquiry in furtherance of a course of ongoing criminality.

### 1. Waiver

■ So far as materials in Doe Corp.'s possession relating to the payment to Lawyer are concerned, the conversation between Accountant and General Counsel and disclosure of the BER to Underwriter Counsel either waives the privilege or, what is much the same thing in the circumstances of this case, evidences a corporate decision to use the materials for purposes other than seeking legal advice.

The conversation between Accountant and General Counsel entailed searching questions as to whether the payment to Lawyer was for purposes of a bribe and detailed answers about Doe Corp.'s investigation of it, including statements that earlier drafts of the BER had, in fact, discussed it. Appellant argues that the participation of the accounting firm was part of the effort to obtain legal advice through preparation of the BER. We agree with Judge Sifton, however, that this particular conversation was sparked by Accountant's responsibilities in conducting the audit, not by Doe Corp.'s seeking of legal advice requiring the aid of an accountant. The final BER (or at least the portions relevant to the payment to Lawyer) had already been prepared at the time of the conversation. Accountant testified directly that the payment issue had arisen in the course of the audit and that he had initiated the inquiry with General Counsel "to resolve the audit issues." We have previously held that statements to accountants unrelated to the seeking of legal advice are not privileged. *In re Horowitz*, 482 F.2d 72, 81 (2d Cir.), *cert. denied*, 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973). That the discussion mentioned the BER does not detract from this conclusion since the integrity of the BER was relevant to the audit and certification of the 1977 financial statements.[4]

We believe, moreover, that the disclosure to Underwriter Counsel also waived the

---

4. We do not reach the question of whether the January 1978, disclosure of the BER to the accounting firm constitutes a waiver. Judge Sifton found that disclosure to be part of the BER process in which the accounting firm was

participating as an aid to the legal department. April 30, 1981, Op. at 15. Accountant testified, however, that the 1977 financial statement would have received only a qualified opinion if the BER had not been produced. This disclo-

privilege so far as the payment to Lawyer is concerned. This is a more difficult conclusion to reach since the final BER made no mention of that payment. But General Counsel's statement to Accountant that mention had been made in earlier drafts and deleted after his investigation supports, we believe, the conclusion that silence was intended by Doe Corp. as an affirmance to all who read the BER of the propriety of the payment. Underwriter Counsel testified that bribes to public officials would have led him to ask Doe Corp. to include disclosure in its registration statement. Designation of the BER as a report on questionable practices and deletion of the discussion relating to Lawyer in the final draft leads us to conclude that silence in this case was not a neutral statement.

Doe Corp. argues that disclosure to Underwriter Counsel was not voluntary because it was coerced by the legal duty of due diligence and the millions of dollars riding on the public offering of registered securities. We view this argument with no sympathy whatsoever. A claim that a need for confidentiality must be respected in order to facilitate the seeking and rendering of informed legal advice is not consistent with selective disclosure when the claimant decides that the confidential materials can be put to other beneficial purposes. Federal securities laws put a price of disclosure upon access to interstate capital markets. Once materials are utilized in that disclosure, they become representations to third parties by the corporation. The fact that they were originally compiled by attorneys is irrelevant because they are serving a purpose other than the seeking and rendering of legal advice.

█ The privilege itself is an exception to the critically important duty of citizens to disclose relevant evidence in legal proceedings. It does not shield communica-

tions which serve purposes other than those which led to judicial recognition of the privilege. *Id.* at 81. In the corporate context, restricting internal inquiries about particular matters to corporate counsel in the name of the giving and receiving of legal advice will afford the benefits of the privilege only so long as those inquiries and the responses they generate are used only for the designated purposes. Once a corporate decision is made to disclose them for commercial purposes, no matter what the economic imperatives, the privilege is lost, not because of voluntariness or involuntariness,[5] but because the need for confidentiality served by the privilege is inconsistent with such disclosure.

The District of Columbia Circuit recently considered a somewhat analogous case involving disclosure to one governmental agency in order to expedite proceedings under an agreement restricting disclosure to that agency while claiming the privilege as to subsequent demands by other agencies. *Permian Corp. v. United States*, 665 F.2d 1214 (D.C.Cir.1981). That Court rejected a "pick and choose" theory of attorney-client privilege. We agree with the sentiment and note that the case before us is somewhat stronger since it does not involve an agreement with a governmental agency purporting to protect the privilege so far as other agencies are concerned.

### 2. Ongoing Criminality

█ Appellant claims that the District Court should not have permitted the *in camera* submission by the government or at the least should have required that it be afforded a description of each item of evidence so that it might have a minimal opportunity to respond.

While "*[i]n camera* proceedings are extraordinary events in the constitutional frame-

---

sure of the BER, therefore, may well have been for the additional purpose of facilitating the public offering of registered securities.

**5.** This is not a case where disclosure resulted from the tortious or criminal acts of a third party or court order for production allowing insufficient time for the party to separate privi-

leged from non-privileged documents. *Transamerica Computer Company, Inc. v. International Business Machines Corp.*, 573 F.2d 646 (9th Cir. 1978). We hold only that the calculated use of otherwise privileged materials for commercial purposes will waive the privilege.

work" because they generally deprive one party to a proceeding of a full opportunity to be heard on an issue, *In re Taylor*, 567 F.2d 1183, 1187 (2d Cir. 1977), they are by no means forbidden or without real usefulness in particularized circumstances. For example, they have been used to test claims of state secrets, *Halkin v. Helms*, 598 F.2d 1 (D.C.Cir.1978); to excise material protected by privilege from that which is not, *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); to examine statements claimed to be irrelevant for purposes of the Jencks Act, 18 U.S.C. § 3500(b), *Palermo v. United States*, 360 U.S. 343, 354, 79 S.Ct. 1217, 1225, 3 L.Ed.2d 1287 (1959); *United States v. Pacelli*, 491 F.2d 1108 (2d Cir.), *cert. denied*, 419 U.S. 826, 95 S.Ct. 43, 42 L.Ed.2d 49 (1974); and to determine which of several instances of electronic surveillance might be challenged by a particular defendant, *Taglianetti v. United States*, 394 U.S. 316, 89 S.Ct. 1099, 22 L.Ed.2d 302 (1969).

Where conflicting claims about the confidentiality of evidentiary materials arise in preliminary proceedings, *in camera* submissions provide a method of judicial resolution which preserves confidentiality when justified. The present case involves two such conflicting claims. Lawyers played a key role from beginning to end in the alleged criminal schemes. The original payment was to an attorney purportedly representing Doe Corp., the investigation underlying the BER was done by attorneys, an attorney decided to delete mention of the payment in the BER, and an attorney communicated with Underwriter Counsel and Accountant on these matters. As a consequence, Doe Corp. was able to invoke the attorney-client privilege as to a vast area of inquiry by the grand jury, while individuals invoked the privilege against self-incrimination. The government, on the other hand, claiming that the purportedly privileged communications had been used by Doe Corp. for criminal purposes, wanted to present evidence of that fact without breaching the secrecy of grand jury proceedings. An *in camera* submission afforded a reasonable method of resolving these claims.

We recognize that appellants cannot make factual arguments about materials they have not seen and to that degree they are hampered in presenting their case. The alternatives, however, are sacrificing the secrecy of the grand jury or leaving the issue unresolved at this critical juncture. We believe those alternatives less desirable than the *in camera* submission utilized by Judge Sifton. Appellant, after all, is itself asserting a right to confidentiality, and the government wanted to test the validity of that claim. Appellant's argument that the government may not do so without sacrificing its own valid claim to secrecy seems rather ironic in the circumstances. Leaving the issue unresolved, on the other hand, would permit wholly untested claims of privilege to obstruct investigations of federal crimes. There is a public interest in respecting confidentiality of communications by clients to their attorneys, in maintaining the secrecy of grand jury proceedings and in investigating and prosecuting federal crimes. Where these interests conflict or the validity of privilege claims based on these interests are challenged, the limitations on adversary argument caused by *in camera* submissions are clearly outweighed by the benefits of obtaining a judicial resolution of a preliminary evidentiary issue while preserving confidentiality.

Appellant mistakenly claims the *in camera* submission is inconsistent with *In re Taylor, supra.* In that case we reversed a finding based on an *in camera* submission because the appellant would have learned the contents of the submission as soon as he testified and "the secrecy interest ... would [have obtained] only as long as it [would have taken] the appellant to reach the door to the grand jury room...." *Id.* at 1189. Here, the materials contained in the *in camera* submission are not on the verge of disclosure to Doe Corp. and may, in fact, never be disclosed. An ongoing interest in grand jury secrecy is thus at stake.

We do not suggest that *in camera* submissions are to be routinely accepted. Judge Sifton denied the government's first

application. He granted the second only after the breadth of materials covered by the privilege became apparent and evidence raising the issue of ongoing criminality was before him. At that time, there was evidence that $96,500 had been paid to a politically active lawyer holding elective office, that auditors had concluded that Doe Corp. had no records disclosing services rendered in return, that a discussion of the payment had been in early drafts of the BER and then deleted, and that if a bribe had been mentioned in the BER, the underwriter might have compelled public disclosure before going ahead with the securities offering. Given the impact of the assertion of privilege on the grand jury investigation and the existence of evidence casting doubt on its validity, resort to an *in camera* submission was fully justified.[6] In this case, a description of the materials submitted would have seriously breached the secrecy of the grand jury materials and Judge Sifton was correct in not requiring it.

■ We have independently reviewed the *in camera* submission of grand jury materials and other evidence in the record. We have concluded without difficulty[7] that there is probable cause to believe 1) the payment to Lawyer was part of a criminal scheme to bribe a public official(s); 2) a diligent investigation of that payment would not have provided a basis for deleting discussion of the payment to Lawyer from the final BER or for the reassurances given by General Counsel to Accountant in February, 1978; 3) the final BER was used to conceal the criminal scheme from the underwriter for the public offering and the accounting firm certifying the 1977 financial statements; and 4) after the BER investigation, actions were taken in the name of the corporation to cover up the criminal schemes.

It is indisputable that communications made in furtherance of an ongoing crime are not protected by the attorney-client privilege. *In re Doe*, 551 F.2d 899 (2d Cir. 1977); *United States v. Rosenstein*, 474 F.2d 705 (2d Cir. 1973). In the present case, rejection of the claim of privilege rests heavily upon our finding probable cause that the BER investigation conducted by Doe Corp.'s legal department was used by the corporation for purposes other than seeking and receiving legal advice. It was used to induce underwriters and auditors involved in the public offering to believe that no irregularity had been found with regard to the payment to Lawyer. To that extent, our holding on ongoing criminality overlaps with our ruling as to waiver. But it does not rest solely upon that, for we also find probable cause to believe that other actions were taken to cover up the criminal scheme after completion of the relevant portions of the BER.[8]

We recognize that corporate counsel coming upon evidence of criminality in communications protected under *Upjohn* are placed in an uncomfortable position. Their superiors or clients may well fear the commercial or even more serious personal consequences of disclosure. The lawyers' professional relationship to the corporation may extend well beyond aspects relating to criminal liability and leave them torn between a desire to see the firm prosper and their professional and legal obligations. In such cases, the wiser course may be to hire counsel with no other connection to the corporation to conduct investigations such as the BER.

Corporate counsel need not run to the FBI upon the first sign of criminality in an *Upjohn* protected communication. But such communications are protected only for the purpose of the corporate client seeking,

---

6. By the time the contempt judgment was entered, Judge Sifton also had before him the affidavit reciting the interview with Employee B.

7. This is in no sense intended to suggest a probable, much less desirable, outcome either within the grand jury or upon further judicial proceedings, if any. It is to say only there is

direct evidence, not implausible on its face, specifically supporting a conclusion as to probable cause.

8. The government's brief states the grand jury is investigating possible violations of 18 U.S.C. §§ 1952, 1343, 1001; 15 U.S.C. § 77x.

and the attorney rendering, legal advice. *In re Grand Jury Subpoena*, 599 F.2d 504 (2d Cir. 1979). Use of the fact of an investigation to allay the concerns of third parties about possible criminal acts, to create the appearance of compliance with laws requiring disclosure, or to cover up a crime disclosed through a protected communication in the course of the investigation will cause the corporation to lose the privilege.

## THE WORK–PRODUCT IMMUNITY

Judge Sifton held that the government had made a sufficient showing of need to overcome the work-product doctrine. In *Upjohn, supra,* the Supreme Court indicated that work-product involving the mental processes of attorneys need be divulged, if at all, only on a strong showing "of necessity and unavailability by other means." 449 U.S. at 402, 101 S.Ct. at 688.

■ The evidence sought in the present case does potentially involve the mental processes of members of Doe Corp.'s legal department. Memoranda concerning the deletion from the BER of any mention of the payment to Lawyer would almost certainly reveal these processes, if probative. Answers to questionnaires and the contents of interviews of Employees A and B might also indicate the factual areas believed to be of importance by Doe Corp.'s legal department or contain other matters directly or indirectly reflecting their legal theories.

So far as documents relating to deletion of any mention of the payment to Lawyer in the BER is concerned, the work-product itself may be part of a criminal scheme and all reason for protecting it from judicial examination evaporates. Ever since *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), the purpose of the work-product immunity has been to avoid chilling attorneys in developing materials to aid them in giving legal advice and in preparing a case for trial. The fear of disclosure to adversaries of normal work-product would severely affect performance of the lawyer's role and result in "[i]nefficiency, unfairness and sharp practices. . . ." *Id.* at 511, 67 S.Ct. at 393. No such danger is at stake in a case like the present one, however, where we find probable cause to believe that preparation and use of the BER was part of a scheme of ongoing criminality. Given the finding of probable cause that the deletion in the BER concealed the criminal scheme from the underwriter and auditors, the present case entails none of the dangers associated with the disclosure of normal and legitimate work-product. *Cf. United States v. Nixon, supra.* To the contrary, where so-called work-product is in aid of a criminal scheme, fear of disclosure may serve a useful deterrent purpose and be the kind of rare occasion on which an attorney's mental processes are not immune. See *In re Murphy,* 560 F.2d 326, 336 n. 19 (8th Cir. 1977).

■ The interviews of Employees A and B present a somewhat different question. Here the mental processes or legal theories of the interviewing attorney are not independently discoverable. What is sought is what Employees A and B said, not the attorney's evaluation of potential liability or thoughts as to use at trial. Because the *Upjohn* privilege has been lost as to these communications, *ante* at 488–492, the attorney-client privilege is no bar to production.[9] The need for the contents of the interviews is self-evident. Quite apart from the truth of the matters asserted therein, which is clearly pertinent, the statements may be relevant simply for the fact they were made because they may tend to prove what Doe Corp. knew and when it knew it. On that issue, the notes may be the only available evidence.[10] As to statements made by Employees A and B to the

---

**9.** Compare *Upjohn, supra,* 449 U.S. at 401, 101 S.Ct. at 687:

> The notes and memoranda sought . . . are work-product based on oral statements. If they reveal communications, they are . . . protected by the attorney-client privilege. To the extent they do not reveal communica-

tions, they reveal the attorneys' mental processes. . . .

**10.** Employee B's memory is hazy and other potential witnesses have invoked the privilege against self-incrimination.

attorney, the government has met its burden of showing a substantial need.

That does not, however, dispose of appellant's contention that the mental processes and legal theories of the interviewing attorney may be disclosed if the notes are produced. These are entitled to the greatest protection available under the work-product immunity. See Rule 26(b)(3), F.R.C.P.; *Upjohn*, 449 U.S. at 399–401, 101 S.Ct. at 687–688. Nevertheless, we have examined *in camera* the notes of the Employee A interview, see *In re Murphy*, 560 F.2d at 336 n. 20, and agree totally with Judge Sifton that their production will not trench upon any substantial interest protected by the work-product immunity. The notes recite in a paraphrased, abbreviated form, statements by Employee A relating to events surrounding the payment to Lawyer. To the extent that the statements imply the attorney's questions from which inferences might be drawn as to his thinking, those inferences merely disclose the concerns a layman would have as well as a lawyer in these particular circumstances, and in no way reveal anything worthy of the description "legal theory." We hold, therefore, that the notes of the Employee A interview must be produced. We need not discuss the notes relating to the interview of Employee B and the answers given by him to the BER questionnaire, since appellant has agreed to produce them if it does not prevail as to the notes relating to the Employee A interview.

### THE MANDATE

The government represents that the exact date on which the statute of limitations will bar prosecution is uncertain, but the earliest possible date is July 7, 1982. Appellant should have an opportunity to seek temporary and other relief in the Supreme Court. Nevertheless, the grand jury's investigation should not be unnecessarily delayed if such relief is not obtained. The mandate of this Court, therefore, shall issue seven days from the date of this opinion.

Affirmed.