**UNITED STATES of America,**

v.

**Alan E. ROSENTHAL, Defendant.**

**No. 91 Cr. 412 (LLS).**

United States District Court,
S.D. New York.

April 16, 1992.
As Corrected May 28, 1992.

U.S. Attorney's Office, S.D.N.Y., New York City, for the U.S.; Karen Patton, Asst. U.S. Atty., of counsel.

Curtis, Mallet–Prevost, Colt & Mosle, New York City, for defendant; Daniel R. Lenihan, Jonathan A. Harris, of counsel.

Dornbush Mandelstam & Silverman, New York City, for David B. Solomon; Martin Auerbach, Martin Mensch.

## MEMORANDUM AND ORDER

BUCHWALD, United States Magistrate Judge.

Alan E. Rosenthal ("Rosenthal") was charged on May 9, 1991, in a multi-count indictment for acts arising out of his position in Drexel Burnham Lambert Incorporated's ("Drexel") High Yield and Convertible Bond Department. Michael R. Milken and David B. Solomon ("Solomon") were named as unindicted co-conspirators. Of particular relevance to this application is the charge that the co-conspirators engaged in a series of "payment trades" in which the prices of securities trades were inflated or lowered in order to misappropriate monies from Solomon Asset Management, Inc.'s ("SAM") clients to reimburse Drexel for a portion of the fees SAM had earned managing Finsbury Group, Ltd. ("Finsbury"), a mutual fund established by Drexel.

Presently before this Court is a motion brought on by an Order to Show Cause, signed on February 14, 1992, whereby defendant Rosenthal seeks to enforce two subpoenas, issued on January 7, 1992 by Judge Louis L. Stanton pursuant to Fed. R.Cr.P. 17(c) and directed to Price Waterhouse and the law firm of Dornbush, Mandelstam & Silverman, counsel for Solomon. Specifically, the subpoenas seek:

(1) All draft and/or final reports, and underlying work papers and schedules, pertaining to any accounting or analysis conducted by Price Waterhouse of securities trading by David B. Solomon and/or Solomon Asset Management, Inc. prepared in connection with the Final Judgment of Permanent Injunc-

tion and Other Equitable Relief entered on November 27, 1990 in *Securities and Exchange Commission v. David B. Solomon,* 90 Civ. 7582 (S.D.N.Y.).

(2) All correspondence and records of communications with the United States Attorney's Office for the Southern District of New York and/or the Securities and Exchange Commission pertaining to the accounting or analysis identified in (1), above.[1]

By cross-motion, dated February 20, 1992, Solomon sought to quash the subpoenas and for the entry of a protective order for any materials which Solomon has or will produce in response to the subpoenas. Rosenthal does not object to the entry of the protective order.[2] Throughout, Solomon agreed to provide a copy of the report to the defendant once it was finalized and otherwise disclosed.

The documents sought came into existence under the following circumstances. On November 27, 1990, the Securities and Exchange Commission ("SEC") and Solomon entered into a "Final Judgment of Permanent Injunction and Other Equitable Relief as to David Solomon" ("Final Judgment"), which provided in relevant part:

Within 90 days of the entry of this FINAL JUDGMENT, which period of time may be extended by the staff of the Commission, SOLOMON shall, with the assistance of the independent accountant to be retained by SOLOMON or his counsel pursuant to Paragraph XV. C. below, provide the COMMISSION with an accounting identifying the clients damaged as a result of the conduct alleged in paragraphs 51 through 83 of the COMPLAINT relating to "payment" trades and securities purchased for Drexel's benefit. Such accounting shall include the amounts owed to each such client, together with any substantiating documentation that the COMMISSION may request to assist it in formulating the

---

1. This memorandum proceeds on the assumption that there is no controversy between the parties concerning this latter paragraph of the subpoena.

2. We assume that counsel has or will confer with respect to the protective order and submit a proposal to the Court for signature.

Plan or Plans of Distribution referred to in Paragraph XIII below.

The Final Judgment also provided for the payment by Solomon into two escrow funds, one entitled the "Investment Advisory Disgorgement Fund." That fund is to be used to compensate current and former investment advisory clients of SAM or its successor for damages or losses incurred as a consequence of the "payment trades."

Thereafter, on December 3, 1990, an engagement letter with Price Waterhouse was signed. Of particular note are the following portions of that engagement letter:

We are pleased to accept the engagement to assist you (references to "you" or to "DM & S" refer to Dornbush Mandelstam & Silverman) in connection with certain undertakings of David B. Solomon ("Solomon") under the Final Judgement of Permanent Injunction and Other Equitable Relief as to David B. Solomon ("Final Judgement"). In this connection you have advised us as follows:

\* \* \* \* \* \*

4. Under the terms of the Final Judgement, Solomon shall, with the assistance of independent accountants to be retained by Solomon or his counsel, provide the Commission with an accounting identifying the clients damaged ("Affected Clients") as a result of the conduct alleged in the Complaint during the period April 1, 1983 to December 31, 1986, relating to "payment" trades and securities purchased for Drexel's benefit.

5. We understand that we are being engaged by DM & S as the independent accountants provided for by the Final Judgement. Copies of the Complaint and the Final Judgement have been provided to us by you.

\* \* \* \* \* \*

We will work with DM & S in developing methods and procedures for the purpose of carrying out this engagement and you have advised us that Solomon, and CCM, will cooperate with our engagement and will assist in identifying and describing transactions involving Affected Clients. We will furnish to DM & S a report (the "Report") containing our findings and conclusions and the procedures applied by us to the data, records and information made available to us.

Further, Solomon relies on this additional portion of the engagement letter.

We understand, of course, that you are retaining us in your capacity as attorneys for Solomon and that this engagement is in contemplation of possible litigation. Accordingly, you have advised us that all information, data, records and other matters obtained, and all work performed, by us in connection with this engagement ("Confidential Information") shall be subject to the attorney/client and/or attorney work product privileges, shall be maintained by us in confidence and shall not be disclosed to any other person, firm or corporation without your written consent.

The report contemplated by the Final Judgment and the engagement letter was furnished to the United States Attorney's Office, Southern District of New York, the defendant, and the Court on April 3, 1992. In addition, Solomon has made certain other responsive documents available to the defendant.[3] Solomon's resistance to the remaining items sought by the subpoena is not primarily based upon a contention that the subpoenas do not meet the basic conditions of relevancy, admissibility and specificity set out in *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). Rather, Solomon asserts that the documents sought which he is unwilling to produce are protected from disclosure by the attorney-client privilege and the work product doctrine.[4]

We find one fact to be of overriding importance to the resolution of the issues

---

3. We understand that many of these documents had previously been made available to the defendant by the United States Attorney's Office.

4. We do note, however, that at various times during oral argument counsel for Solomon has questioned the relevance and admissibility of the material.

raised by pending applications: namely, that Price Waterhouse was engaged to prepare a report relating to "payment trades" as required by the Final Judgment, and furthermore, that the product of Price Waterhouse's efforts was going to be disclosed.

■ While Solomon has not disputed his obligation to make available the Price Waterhouse report to the defendant when the report is completed and provided to the Government, it is, nonetheless, analytically helpful to discuss whether Solomon would be entitled to assert a claim of work product and/or attorney-client privilege if he did not volunteer to disclose the report. In my view, Solomon could not successfully resist disclosure of the report under either an attorney-client privilege or a work product analysis.

■ First, applying an attorney-client privilege analysis, the report could not be withheld pursuant to an assertion of that privilege. Fundamentally, the privilege, which protects confidential communications to obtain legal advice, does not apply because Price Waterhouse was not engaged to assist counsel in providing legal advice to Solomon. Although Price Waterhouse was hired by counsel, the conclusory suggestion that Price Waterhouse was engaged to assist counsel in providing legal advice to Solomon, Affidavit of Martin J. Auerbach, sworn to on February 20, 1992, ¶ 12,[5] does not withstand analysis. Rather, the record supports the conclusion that Price Waterhouse was hired to assist counsel in fulfilling Solomon's obligations to the SEC pursuant to the requirements of the Final Judgment. As the engagement letter recites: "We [Price Waterhouse] understand that we are being engaged by DM & S as the independent accountants provided for by the Final Judgment." Statements to accountants unrelated to the seeking of legal advice are not attorney-client privileged. *In re Horowitz*, 482 F.2d 72, 81 (2d

Cir.), *cert. denied*, 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973).

■ Second, even if we assume that Price Waterhouse should be considered an agent of counsel, the attorney-client privilege need not attach. If a client communicates material to his attorney with an understanding that it will be communicated to others, the communication as well as related details will not be considered privileged because the requisite confidentiality has not existed from the outset. *United States v. Tellier*, 255 F.2d 441, 447–48 (2d Cir.), *cert. denied*, 358 U.S. 821, 79 S.Ct. 33, 3 L.Ed.2d 62 (1958). Both in terms of the anticipated disclosure to the SEC, and the language of the report, there were communications from Solomon which would not come within the scope of the privilege.

Third, again assuming *arguendo* that Price Waterhouse had been engaged to assist counsel in providing legal advice to Solomon, the fact of disclosure of Solomon's communications, as has occurred with the production of the report, waives any privilege that might have attached:

> A claim that a need for confidentiality must be respected in order to facilitate the seeking and rendering of informed legal advice is not consistent with selective disclosure when the claimant decides that confidential materials can be put to other beneficial purposes.

*In re John Doe Corp.*, 675 F.2d 482, 489 (2d Cir.1982).

Actual disclosure of the report having occurred, the only theoretical issue that remains is the extent of the waiver. It is generally held that the disclosure of an otherwise attorney-client privileged communication results in "subject matter waiver." Breckinridge L. Willcox, *Martin Marietta and the Erosion of the Attorney-Client Privilege and Work-Product Protection* ("Willcox"), 49 Md.L.Rev. 917, 923 (1990). And while the Second Circuit's opinions may not be entirely consistent on

---

**5.** Paragraph 12 of counsel's affidavit broadly states: "having been retained by DM & S ["Dornbush Mandelstam & Silverman"] to assist in rendering legal advice to Mr. Solomon with respect to interpreting and fulfilling the terms of the Final Judgment, and in anticipation of potential litigation over 'payment' trades Price Waterhouse is an agent of DM & S for purposes of the attorney-client privilege."

this issue, *compare In re John Doe Corp.*, 675 F.2d 482, 489 (2d Cir.1982) (rejecting selective waiver in the attorney-client privilege context) *with In re Von Bulow*, 828 F.2d 94, 102 (2d Cir.1987) (holding that "the extrajudicial disclosure of an attorney-client communication—one not subsequently used by a client in a judicial proceeding to his adversary's prejudice—does not waive the privilege as to the undisclosed portions of the communication."), any arguable inconsistency need not be resolved here, both because of our finding that the attorney-client privilege did not attach at the outset and the terms of the Final Judgment which made disclosure likely. In sum, all documents reflecting the communications from Solomon referred to in the report should be produced.

 We turn now to the applicability of the work product doctrine. To be entitled to work product protection, a document must be created in anticipation of litigation or for trial. Fed.R.Civ.P. 26(b)(3); *United States v. Nobles*, 422 U.S. 225, 238, 95 S.Ct. 2160, 2170, 45 L.Ed.2d 141 (1975) (applying the doctrine in the criminal context). Recognizing that documents may be created for more than one purpose, the threshold issue as to the applicability of work product protection has been described as requiring an inquiry into "the primary motivational purpose behind the creation of the document." *United States v. Gulf Oil Corp.*, 760 F.2d 292 (Temp.Emer.Ct.App. 1985) (citation omitted). In this factual context, the inquiry is easily resolved and well supported by the documentary record. The report prepared by Price Waterhouse was created because of the Final Judgment; it would not have been created otherwise. Nor does the fact that Solomon was a defendant in another litigation, *Finsbury Group Ltd. v. Milken, et al.*, 90 Civ. 3780 (RO) (S.D.N.Y.), or a potential defendant in other possible litigations arising out of the "payment trades" at the time the Final Judgment was entered, alter the analysis as Solomon suggests. *Cf. In re Atlantic Financial Management Securities Litigation*, 121 F.R.D. 141, 144–45 (D.Mass.1988). While the existence of the other litigation was no doubt in Solomon's and his counsel's consciousness, there is simply no basis to conclude that Price Waterhouse would have been engaged, and the report drafted, had the SEC not demanded its creation.

 Nonetheless, a determination that the final Price Waterhouse report is not entitled to work product protection does not resolve the issue of the discoverability of documents which were created in connection with the report. Simply stated, we must determine the legal consequences of the disclosure of the report for the discoverability of related documents withheld under a claim of work product. If we apply the traditional work product waiver analysis, i.e., does the disclosure substantially increase the possibility that an opposing party could obtain the information disclosed, *see, e.g., Westinghouse v. Republic of the Philippines*, 951 F.2d 1414, 1428 (3d Cir.1991); *GAF Corp. v. Eastman Kodak Co.*, 85 F.R.D. 46, 51–52 (S.D.N.Y.1979), we can only answer the question in the affirmative at least for some documents. As mentioned earlier, the Final Judgment provides that the SEC may request "any substantiating documentation" that it may need to formulate the plans of distribution. This negotiated waiver requiring the production of substantiating documentation is consistent with the holding in *In re Sealed Case*, 676 F.2d 793, 824 (D.C.Cir.1982), that, as a matter of law, submission of a report to the SEC constitutes a waiver for any other documents necessary to a fair evaluation of the representations in the report.[6] Thus, all documents which would substantiate statements and conclusions reached in the report should be produced.[7]

---

**6.** The approach to waiver applied by the Third Circuit in *Westinghouse* would lead to the same result because the disclosure here was not for a work product purpose. *Westinghouse*, 951 F.2d at 1429.

**7.** We recognize that the engagement letter is drafted in a manner designed to preserve any applicable attorney-client and work product privilege. However, a court cannot be bound by counsel's drafting efforts. *See also Willcox* at 937.

The only question remaining is whether the application of a broader, subject matter waiver test ought to be applied under the rubric of fairness or otherwise. We answer this question in the negative. First, there is no possibility of testimonial inconsistency as there was in *United States v. Nobles*. Second, even if the Government was relying on the Price Waterhouse report in its prosecution, which it is not, the fact remains that the Government must put on its proof at trial and it is that proof to which Rosenthal must respond. Willcox at 927 n. 76. Third, in traditional evidence terms, there are serious issues of the admissibility of the materials sought. *Id.* at 929. And finally, all the cases, *United States v. Nobles*, 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975) and *In re Martin Marietta Corp.*, 856 F.2d 619 (4th Cir. 1988), *cert. denied*, 490 U.S. 1011, 109 S.Ct. 1655, 104 L.Ed.2d 169 (1989) included, go to great lengths to protect opinion work product, which would appear to be a substantial portion of the documents withheld.

In conclusion, the motion to enforce the subpoenas is granted in part and denied in part. Likewise, the motion to quash is granted in part and denied in part.[8]

IT IS SO ORDERED.

---

**8.** If the parties have any disputes concerning which of the withheld documents should be produced, those disputes should be presented to this Court by reference both to the specific language in the report and the related document on the privilege list.