In re GRAND JURY SUBPOENA
(LEGAL SERVICES CENTER).

In re GRAND JURY SUBPOENA
(PAPPAS & LENZO).

M.B.D. Nos. 85–34–F, 85–35–F.

United States District Court,
D. Massachusetts.

Aug. 8, 1985.

Jeanne Baker, Silverglate, Gertner, Baker, Fine & Good, Boston, Mass., John Callahan, Stephen R. Kaplan, Northampton, Mass., for No. M.B.D. 85–34–F.

Mary Beth Carmody, Asst. U.S. Atty., Springfield, Mass., for No. M.B.D. 85–35–F.

## MEMORANDUM [1]

FREEDMAN, District Judge.

Petitioners in the above-captioned cases are custodians of records of a legal service clinic and a private law firm who have been served with subpoenas *duces tecum* commanding them to produce to the federal grand jury their legal files relating to their respective representations of two Nigerian nationals and their alleged American spouses in pending proceedings before the Immigration and Naturalization Service ("INS").[2] Petitioners have moved pursuant to Fed.R.Crim.P. 17(c) to quash these subpoenas, relying on the attorney-client privilege, the work product doctrine (both factual and opinion), the fifth amendment privilege against self-incrimination, and as being unduly burdensome and oppressive in the context of ongoing legal representation of the clients.

Mohammed O. Odufowora and Rudna Delores Lee, clients of Pappas & Lenzo, and Elizabeth Adesanya Parker and Dwight D. Parker, clients of Legal Services Center, have moved to intervene in these cases. Fed.R.Civ.P. 24(a). The Court has allowed these motions.

On July 29, 1985 the Court heard oral arguments from all parties on petitioners' motions to quash and gave parties the opportunity to file additional briefs with the Court. On August 7, 1985, after having carefully considered the matter, the Court allowed petitioners' motions to quash the subpoenas *duces tecum.*

### I.

Briefly stated, the facts of these cases are as follows: The Grand Jury is conducting an investigation into alleged conspiracies to circumvent the immigration laws by entering into sham marriages. Specifically, the Grand Jury is investigating alleged violations of 18 U.S.C. § 371 (conspiracy to commit an offense or defraud the United States); 18 U.S.C. § 1001 (making false or fraudulent statements); 18 U.S.C. § 1621 (perjury); 18 U.S.C. § 1622 (subornation of perjury); and 18 U.S.C. § 2 (aiding and abetting).

With respect to the Legal Services Center, the government contends that its clients, Elizabeth Adeshola Adesanya and Dwight D. Parker, entered into a sham marriage to circumvent the immigration laws of the United States and that the true

---

**1.** Because both cases raise very similar legal and factual considerations, the Court is issuing one Memorandum dealing with both cases but has issued separate Orders for each.

**2.** The subpoena to the Legal Services Center seeks:

Any and all files of the Legal Services Center relating to the representation of ELIZABETH ADESHOLA ADESANYA (aka Elizabeth A. Parker, Elizabeth Sanya Parker) and/or DWIGHT. D. PARKER, concerning the immigrant status of ELIZABETH ADESHOLA ADESANYA (aka Elizabeth A. Parker, Elizabeth Sanya Parker) including but not limited to the following documents: correspondence with the clients, memoranda or other records of conversations and meetings with the clients, and other parties, including calendars or daily diaries, copies of reports of inquiries of investigations conducted on behalf of the clients, copies of documents obtained from the clients

or other sources relevant to the representation of the clients, billing records, time sheets or other records of time expended on behalf of the clients, drafts of documents prepared for filing, and copies of documents filed on behalf of the clients.

If any of the documents requested are claimed to fall within the attorney-client privilege, please provide a list of any such document by date, author, recipient(s) (name and address), nature of the document and a brief description of the document.

The subpoena issued to Pappas & Lenzo is identical to the Legal Services Center subpoena except that it calls for "any and all files relating to the representation of MOHAMMED O. ODUFOWORA (aka Mohammed Odus) and/or RUDNA DELORES LEE (aka Rudna Delores Lee Odufowora, Rudna Odus, Renee Lee) concerning the immigration status of Mohammed Odufowora...."

nature of this marriage was known (or at least reasonably should have been known) to the staff of the Legal Services Center when it prepared a second Petition to Classify the Status of Alien Relative for the Issuance of an Immigrant VISA (I–130) on behalf of Elizabeth Adesanya and Dwight Parker and an accompanying affidavit of Dwight Parker. Previously, Adesanya Parker had filed an earlier I–130 petition which had been denied on August 15, 1983 by the District Director of the INS because of a lack of prosecution and his finding that their marriage was a sham entered into for the primary purpose of evading immigration laws. Part of the reason for this denial was that the man who showed up for the INS "marriage interview" with Elizabeth Adesanya was an imposter. The real Dwight Parker admitted as much in a February 10, 1983 affidavit which stated, "I never filed any papers with Immigration on [Adesanya's] behalf. I never went to Boston with her for an interview." [3] This form affidavit, executed in the presence of only David Golden, an investigative officer of the INS, also set out a pre-printed waiver of Miranda rights and included the statement that "I am willing to make a statement without anyone else being present."

The attorneys representing Ms. Adesanya knew of the adverse INS ruling and of the content of the original Dwight Parker affidavit. Nevertheless, they filed the second I–130 petition on behalf of Parker and Adesanya along with a sworn affidavit of

Parker dated October 15, 1984 which contradicted and explained many of the statements contained in his earlier affidavit.[4]

The government also contends that the law firm of Pappas & Lenzo was involved in an attempt to circumvent the immigration laws by filing petitions setting forth the existence of an allegedly sham marriage between Mohammed Odufowora and Rudna Delores Lee. Specifically, the government contends that Attorney Dean G. Corsonnes, a member of the law firm of Pappas & Lenzo, prepared two Petitions to Classify Status of Alien Relative for Issuance of Immigrant VISA (I–130) on behalf of Rudna Delores Lee. The first was filed on September 15, 1983 but was withdrawn by the petitioner because she admitted that her marriage was a sham entered into to circumvent immigration laws. Attorney Corsonnes represented Mohammed Odufowora at a deportation hearing on June 14, 1984, at which Mr. Odufowora effectively admitted deportation; i.e., that his former immigrant status as a student had expired and that he remained in the United States without authorization. Subsequently, Mr. Corsonnes prepared and submitted a second I–130 petition accompanied by a sworn affidavit signed by Rudna Delores Odufowora, dated July 5, 1984, which the government contends was also drafted by Corsonnes. This affidavit states that the earlier withdrawal of the first I–130 petition was a product of coer-

---

3. The affidavit also contains the following statement relevant to the question of whether the marriage was, in fact, a sham.

> While employed at Springfield Technical Community College in the fall of 1980, I met Elizabeth Adesanya. A couple of months later on December 10, 1980, I married her. Part of the reason I married her was because I cared for her. I also realized that by marrying her I could hopefully get her citizenship. Things didn't work out. We actually never lived together as husband and wife.

4. The second affidavit which the government asserts was drafted by the Legal Services Center, recounts that Parker married Adesanya after dating her for a period of four months because of his affection for her and their intention to start a family. However, Parker claims that

during the course of their marriage he suffered from alcohol addiction which caused him to live apart from his wife for extended periods of time. During the time in which Adesanya's first I–130 application was pending before the INS, Parker was undergoing treatment for his alcoholism both as an inpatient and an outpatient. Because of his ongoing treatment for alcoholism, he was unable to attend the INS marriage interview. Adesanya, believing that her petition would be denied if her husband failed to show up, found someone to impersonate her husband. Finally, in the affidavit, Parker states:

> Our marriage has never been a sham. We married out of affection, and with a full intention to build a married life. For a while, due to my addiction, we had difficulties. It was translated into an inaccurate affidavit written by Officer Golden and signed by me.

cion by David Golden, the INS investigator. She further asserts that her marriage was bona fide and not entered into to circumvent immigration laws.

It is the government's position that by filing the second I–130 petition, Corsonnes knew, or reasonably should have known, that his clients' marriage was a sham and that he was assisting them in defrauding the United States by knowingly filing false and perjurious statements.

## II.

■ The Court begins its analysis, as did the First Circuit, with the proposition that the Grand Jury has the right and duty to procure the evidence of every person. *In re Grand Jury Matters*, 751 F.2d 13, 16 (1984) *citing United States v. Dionisio*, 410 U.S. 1, 9–10, 93 S.Ct. 764, 769–70, 35 L.Ed.2d 67 (1973). This right is not without limitation however: "The grand jury's right to every man's evidence is substantially limited only by express 'constitutional, common-law or statutory [privileges and is also] subject to judges' supervisory powers', which, under Fed.R.Crim.P. 17(c), include the power promptly to 'quash or modify the subpoena if compliance would be unreasonable or oppressive.'" *In re Grand Jury Matters*, 751 F.2d at 17. In the instant case, the petitioners have asserted by way of exceptions to this general rule, the attorney-client privilege, the work product doctrine, the fifth amendment privilege against self-incrimination, as well as a prudential argument directed to the Court's discretion under Fed.R.Crim.P. 17(c) in support of their motions to quash.

## A.

The first privilege asserted by petitioners, the attorney-client privilege, is "the oldest of the privileges for confidential communications known to the common law." *Upjohn v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981). The purpose of the privilege is to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interest in

the observance of law and the administration of justice." *Id.* Our system of jurisprudence is underpinned by the very basic supposition that the critically important frank communication between attorney and client would not occur if the attorney-client were readily subjected to outside scrutiny. *See Fisher v. United States*, 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976).

The scope of the attorney-client privilege has been described as follows:

> The privilege applies only if (1) the asserted holder of the privileges sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney is informed (a) by the client; (b) without the presence of strangers; (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*United States v. United Show Machinery Corp.*, 89 F.Supp. 357, 358–59 (D.Mass. 1950).

The work product doctrine rests on similar concerns. The Supreme Court first recognized the work product doctrine in *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). The Court held:

> In performing his various duties, however, it is essential that a lawyer work with a certain degree of privacy free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that he assemble information, sift what he considers to be relevant from the irrelevant facts, prepare his legal theories and plan his strategies without undue and needless interference. That is the historical and necessary way in which lawyers act within the framework of our system of

jurisprudence to promote justice and to protect their client's interests.

*Id.* at 511, 67 S.Ct. at 393. The work product doctrine has been substantially incorporated in Fed.R.Civ.P. 26(b)(3). This rule differentiates between the discovery of documents and tangible things (fact work product) which require a showing of substantial need and inability to obtain the equivalent without undue hardship *and* "mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning litigation," which require a greater showing before they must be produced. In *Upjohn, supra,* the Supreme Court, while not reaching the question of whether any showing of necessity can ever overcome the protection of "mental processes" work product, held that "a far stronger showing of necessity and unavailability by other means" is necessary at a very minimum before such material may be discovered. 449 U.S. at 383–84, 101 S.Ct. at 677–80.

Finally, the petitioners and the intervenor-clients have asserted the clients' fifth amendment privilege against self-incrimination. Basically, they argue that the documents in possession of the attorneys may implicate the clients' fifth amendment rights. The Supreme Court has held that clients may assert their fifth amendments rights for documents in the possession of the attorneys to the same degree as if the clients held possession to documents themselves. *Fisher,* 425 U.S. at 403–04, 96 S.Ct. at 1577. Because of the Court's conclusions respecting the common law privileges, it is not necessary to reach the question of the constitutional privilege.

### B.

■ Ordinarily, the party asserting a privilege has the burden of demonstrating its applicability. *Matter of Walsh,* 623 F.2d 489, 493 (7th Cir.), *cert. denied,* 449 U.S. 994, 101 S.Ct. 531, 66 L.Ed.2d 291 (1980). The procedure generally followed

is that the party asserting the privilege submits the disputed document to the Court for an *in camera* inspection along with an explanation as to how each particular document falls within the privilege. *In re Grand Jury Witness (Salas),* 695 F.2d 359, 362 (9th Cir.1982). In their pleadings and during the hearing, petitioners objected to this procedure because 1) the government has a preliminary burden of demonstrating relevancy and 2) the subpoenas on their face seek to elicit privileged materials.

In *In re Special Grand Jury No. 81–1 (Harvey),* 676 F.2d 1005, *vacated on other grounds,* 697 F.2d 112 (4th Cir.1982),[5] on which the petitioners rely, the Circuit Court held that when the government seeks to subpoena the files of an attorney representing a client in an ongoing criminal procedure, the government must make a preliminary showing of necessity and relevance before the burden shifts to the petitioner to demonstrate the applicability of a privilege. The Court based its holding on sixth amendment and policy grounds:

> We recognize that normally a subpoena is presumed to be regular in that the subpoenaed party has the burden of showing the information sought is privileged or that there has been an abuse of the grand jury process.... Where the attorney for the target of an investigation is subpoenaed, ... attorney-client privilege considerations and sixth amendment interests arise automatically and a preliminary showing must be made before the attorney can be forced to appear before the Grand Jury.

676 F.2d at 1010. *See contra, In re Grand Jury Proceedings in Matter of Freeman,* 708 F.2d 1571, 1575 (11th Cir.1983).

The Second Circuit has very recently adopted the *Harvey* standard of requiring the government to make a preliminary showing of relevance and reasonable need before an attorney can be compelled to testify before the same grand jury which is

---

**5.** *Harvey* was vacated when the subject of the grand jury investigation took flight. 697 F.2d at 112.

investigating his client. *In re Grand Jury Subpoena Served Upon Doe,* 759 F.2d 968 (2d Cir.1985). The court, in reaching this conclusion, relied on two considerations. First, it took into account the fact that an attorney who was called upon to testify against his client would probably have to disqualify himself from his representation, thus jeopardizing his sixth amendment right to retain counsel of his choice. *Id.* at 973, 975–76. *See* Model Code of Professional Responsibility DR 5–102(B); *cf. Powell v. Alabama,* 287 U.S. 45, 53, 53 S.Ct. 55, 58, 77 L.Ed. 158 (1932). Second, the court also considered the requirements of the "adversary system of criminal justice, particularly when we consider the significance of the attorney-client relationship and the need for an independent bar." *Doe,* 759 F.2d at 975.

While the First Circuit has not ruled definitively on the question of whether the government needs make a preliminary showing of relevance or need before the question of privilege is reached, the court's opinion in *In re Grand Jury Matters, supra,* arguably supports such a procedure. The court held that quite apart from any question of privilege, a district court may consider, in the exercise of its Rule 17(c)'s supervisory powers, the implications of issuing a subpoena for attorneys' files during pending proceedings. 751 F.2d at 17–18 and cases cited.[6]

■ Mindful of importance of the attorney-client relationship to our system of justice, the Court adopts the reasoning of *Harvey* and *Doe* and will require the government to demonstrate, as a preliminary matter, that the information sought by the subpoenas is necessary to the grand jury investigation and that there is no other reasonably available source for that information other than the attorneys' files. Only after this showing is made does the burden shift to the petitioners to demonstrate the applicability of one or more privileges.

**C.**

In the instant case, both the petitioners and their clients are subjects of the Grand Jury's investigation. The government has failed to make any showing of necessity or relevance that would justify requiring the attorneys to disclose their legal files with respect to the Grand Jury investigation of the clients. Based upon the affidavit submitted by the government, it seems clear that the government's case against the clients does not depend in any way upon material that might be contained within the legal files of the petitioners.

■ With respect to the Grand Jury's investigation of the petitioners, however, the government contends that information establishing the culpability of the petitioners cannot be found in any other place and that it would be impossible for the Grand Jury to determine effectively whether there is probable cause to believe that a crime has been committed by petitioners without access to the subpoenaed material. The Court concludes that the government has satisfied its preliminary burden of demonstrating relevancy and necessity. Accordingly, the Court must consider the petitioners' assertion of privileges.

**D.**

■ There is no doubt that " 'blanket assertions of privilege ... are extremely disfavored,' *In re Grand Jury Witness (Salas),* 695 F.2d 359, 362 (9th Cir.1982), and that the persons claiming a privilege 'must establish the elements or privilege as to each record sought and each question asked so that ... the court can rule with specificity.' *Matter of Walsh,* 623 F.2d 489, 493 (7th Cir.), *cert. denied,* 449 U.S. 994 [101 S.Ct. 531, 66 L.Ed.2d 291] (1980)." *In re Grand Jury Matters,* 751 F.2d at 17 n. 4. Nevertheless, where, as here, nearly every item identified in the Grand Jury subpoena clearly falls within the attorney-client privilege or work product rule, it is unnecessary for the Court to conduct a preliminary *in camera* inspection to estab-

**6.** *In re Grand Jury Matters* is discussed more extensively in Section IV, *infra.*

lish the existence of a privilege. To do so would, in itself, constitute an unnecessary invasion of the privileged relationship between the attorney and his client and of the confidential files of the attorneys.[7]

The cases cited by the First Circuit in connection with its expressed aversion to blanket assertions of privilege are clearly distinguishable by the vastly different scope of the material being sought here. In *Salas,* for example, the grand jury subpoena commanded the production of accounts receivable records, time records, bills, retainer agreements, and records of payments for legal services rendered. The petitioner sought to assert a blanket privilege against disclosing all of these documents. The Circuit Court held, however, that these documents contained both privileged and non-privileged material. In order for the district court to have been able to differentiate properly between the privileged and non-privileged material, an *in camera* inspection should have been made. 695 F.2d at 361–62. Similarly, *Matter of Walsh* involved both privileged and non-privileged communications leading the circuit court to favor an *in camera* inspection of the information. 623 F.2d at 494 & n. 5.

By contrast, the Grand Jury subpoenas in question here seek materials which, on their face, are clearly protected such as "correspondence with the clients," "memoranda ... of conversations and meetings with the clients" and "drafts of documents prepared for filings." Such material is indisputably protected by either the attorney-client privilege or the work product rule. The Court is satisfied that the petitioners have successfully demonstrated the applicability of these privileges to the subpoenaed documents without the necessity for the Court to conduct an *in camera* examination. Having done so, the burden shifts to the government to show that an excep-

tion to the privileges exists which could enable the Court to permit the subpoenas to stand.

## III.

■ The government asserts that the crime-fraud exception applies. The Supreme Court explained this exception as follows: The privilege between attorney and client "takes flight if the relationship is abused. A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law. He must let the truth be told." *Clark v. United States,* 289 U.S. 1, 15, 53 S.Ct. 465, 469, 77 L.Ed. 993 (1933). The crime-fraud exception is equally applicable to claims of work product. *In re Sealed Case,* 676 F.2d 793, 812 (D.C.Cir.1982); *In re Grand Jury Proceedings (FMC Corporation),* 604 F.2d 798, 803 (3rd Cir.1979).

■ For the government to be able to invoke this exception, it need make a *prima facie* showing that the client consulted the attorney and the furtherance of an ongoing or future illegality but not for past crimes or frauds. *Clark,* 289 U.S. at 15, 53 S.Ct. at 469. *In re Sealed Case,* 676 F.2d 793, 812 (D.C.Cir.1982). The Circuit Court of the District of Columbia has explicated the standard further:

> Communications otherwise protected by attorney-client privilege are not protected if the communications are made in furtherance of a crime, fraud, or other misconduct.... To overcome a claim of privilege, the government need not prove the existence of a crime or fraud beyond a reasonable doubt. Rather, the government must first make a *prima facie* showing of a violation sufficiently serious to defeat the privilege and second, establish some relationship between the communication at issue and the *prima facie* violation. A *prima facie* violation

---

7. The only items mentioned in the subpoenas which arguably fall outside any of the privileges asserted are: "billing records, time sheets and other records of time expended on behalf of the clients...." *Cf. In re Grand Jury Proceedings,* 600 F.2d 215, 218 (9th Cir.1979). This material would appear to be of dubious value to the

Grand Jury. Hence, though it is probable that none of the privileges petitioners assert attach to this material, the Court concludes, in the exercise of its discretion under Fed.R.Crim.P. 37(c), that this material does not need to be produced.

is shown if it is established that the client was engaged in or planning a criminal or fraudulent act when it sought the advice of counsel to further the scheme.... The government satisfies its burden of proof if it offers evidence that if believed by the trier of fact would establish the elements of an ongoing crime or fraud.

*In re Sealed Case (Doe & Roe)*, 754 F.2d 395, 399 (D.C.Cir.1985). A similar *prima facie* showing is necessary to defeat the assertion of work product. *Id.* at 399 n. 4.

### A.

 Before reaching the question of whether the government has satisfied its *prima facie* burden, it is necessary to comment on the propriety of the government's submission of the *ex parte* affidavit of INS Investigator David Golden as part of its *prima facie* case. Petitioner Legal Services Center has moved to disclose this affidavit and petitioner Pappas & Lenzo has moved to strike the affidavit in its entirety. The petitioners argue that the general obligation of grand jury secrecy Rule 6(e)(2) is inapplicable in these circumstances.

In support of the *ex parte* nature of the affidavit, the government relies upon Fed. R.Crim.P. 6(e)(2).[8] Rule 6(e)(2) sets out a finite list of persons who are bound by a general rule of grand jury secrecy. The penultimate sentence of this subsection of Rule 6(e) specifically states that "[n]o obligation of secrecy may be imposed on any person except in accordance with this rule." According to the Advisory Committee, "the rule does not impose any obligation of secrecy on witnesses.... The seal of secre-

cy on witnesses seems an unnecessary hardship and may lead to injustice if a witness is not permitted to make a disclosure to counsel or to an associate." Fed.R. Crim. 6 Advisory Committee Note. It might be possible that Inspector Golden could be included in the Rule 6(e)(3)(A)(ii) provision for "such government personnel as are deemed necessary by an attorney for the government to assist an attorney for the government in the performance of such attorney's duty to enforce federal criminal law." Fed.R.Crim.P. 6(e)(3)(A)(ii). If Golden were to fall in this exception, the obligation of secrecy would attach to him. However, the government has not brought to the attention of the Court the government's compliance with Fed.R.Crim.P. 6(e)(3)(B) which requires the government to promptly provide the district court before whom the grand jury was impaneled the names of the persons to whom disclosure under Rule 6(e)(3)(A)(ii) has been made. *See* n. 8, *supra*.

Furthermore, while the Golden affidavit purports to disclose the result of the Grand Jury's ongoing investigation, in fact, the Court finds it to be largely the product of Inspector Golden's own investigations. "Disclosure of the affidavit in open court is particularly appropriate where, as here, the information contained therein is a fruit of the Government's own investigatory activity and does not bear the imprint of the Grand Jury's independent initiative." *In re September 1971 Grand Jury*, 454 F.2d 580 (7th Cir.1971), *reversed on other grounds, United States v. Meara*, 410 U.S. 19, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973).

---

8. Fed.R.Crim.P. 6(e)(2) provides in part:
 A grand jury, an interpreter, a stenographer, an operator of a recording device, a typist who transcribes recorded testimony, an attorney for the government or any person to whom disclosure is made under paragraph (3)(A)(ii) of the subdivision shall not disclose matters occurring before the grand jury except as otherwise provided for in these rules. No obligation of secrecy may be imposed on any person except in accordance with this rule.
 The exception of subparagraph (3)(A)(ii) of the rule mentioned above refers to an authorized

disclosure made by a United States Attorney to "such government personnel as are deemed necessary by an attorney for the government to assist an attorney for the government in the performance of such attorney's duty to enforce federal criminal law." Rule 6 further provides that "[a]n attorney for the government shall promptly provide the district court, before which was empaneled the grand jury whose material has been so disclosed, with the names of the persons to whom such disclosure has been made." Fed.R.Crim.P. 6(e)(3)(B).

The government is correct when it states that *ex parte* affidavits and *in camera* submissions are common devices in the context of grand jury investigations. *See, e.g. Doe & Roe*, 754 F.2d at 398; *In Re Sealed Case*, 676 F.2d at 814. Where an affidavit recounts testimony before a grand jury or is clearly the product of a grand jury's own investigation, the government's interest in maintaining grand jury secrecy is undoubtedly heightened. In the instant case, these considerations are simply not present.

Ordinarily, having found that the affidavit should not be relied upon *ex parte*, the Court would order it be revealed to the petitioners or stricken entirely. Given the Court's decision on the merits, however, it seems unnecessary to order the government to reveal these affidavits at this time. The government obviously submitted them with the expectation that they would be under seal. Hence, the Court gives the government the opportunity at this point to either 1) withdraw the affidavit or 2) permit the affidavit to remain a part of the record in the case and submit copies thereof to the petitioners and the intervening parties.

### B.

██ The government's purported *prima facie* showing to satisfy the crime-fraud exception is in two parts. First, the government contends that the clients consulted the petitioners in the furtherance of an ongoing crime or fraud against the government. Specifically, the government accuses the client of misrepresenting the character of their marriages to the INS which, it suggests, constitutes the crimes of filing false or fraudulent statements, 18 U.S.C. § 1001; and perjury, 18 U.S.C. § 1621. The government also contends that the petitioner themselves by "turning a blind eye" to what the government considers obvious indications of the fraudulent character of their clients' marriages, committed offenses against the United States including aiding and abetting, 18 U.S.C. § 2; suborning perjury, 18 U.S.C. § 1622;

and conspiracy to commit an offense or defraud the United States, 18 U.S.C. § 371.

With respect to the government's investigation of the clients, its *prima facie* showing failed because, as discussed *supra* at 964, the government had not satisfied its preliminary showing of relevance and need. There is absolutely no indication that the legal files of the petitioners would help the government's case in any way against the clients.

In addition, aside from the government's failure to satisfy its initial burden of relevance and need, its invocation of the crime-fraud exception in the context of the clients' alleged participation in ongoing or future crimes is not without problems. Specifically, the government's cases rest, to some extent, on the fact that the clients' first I–130 petitions had been either denied (Adesanya) or withdrawn (Odufowora) because of statements by the alleged American spouses admitting that the marriages were shams. However, both Nigerian nationals have filed new I–130 petitions accompanied by affidavits which try to explain the American spouses' earlier statements.

The Court seriously questions the propriety of instigating criminal investigations on the basis of the second filings before the petitions have been acted upon by the INS. Without the benefit of an administrative determination by the INS of the merits of the clients' I–130 petitions, the Court is reluctant to find that a *prima facie* showing of illegality has been made. This distinguishes this case from *Doe & Roe* in which the court noted that, in upholding the subpoenas, the district court correctly relied upon "actual findings of fact by courts of competent jurisdiction that [the clients] had committed an ongoing fraud in litigation in which it was represented by [the petitioners-attorneys]." *Doe & Roe*, 754 F.2d at 401. No such finding has been made as of yet on the second I–130 petitions.

With respect to the Grand Jury's investigation of the petitioners for their participation in alleged conspiracies to circum-

vent the immigration law, very troubling considerations come into play. Relying on *United States v. Sarantos,* 455 F.2d 877 (2d Cir.1972), the government accuses the petitioners of violating federal law by acting "with reckless disregard of whether the statements made in the [I–130] Petition[s] are true and with a conscious effort to avoid learning the truth." Memorandum of the United States in Opposition to Petitioners' Motion to Quash. The government contends that petitioners were put on notice by prior determinations of the INS, conversations between Inspector Golden and the petitioners concerning their clients, and other facts, that should have led them to realize that their clients' marriages were, in fact, fraudulent. Further, in defiance or in reckless disregard of these "facts" the petitioners nevertheless proceeded to file on their clients' behalf claiming the existence of a bona fide marriage.

The holding in *Sarantos* must be carefully examined for what it did and did not contain in light of the unique set of facts before it. Robert Sarantos was an attorney who was convicted of two counts of making false statements to the INS and defrauding the United States government in violation of 18 U.S.C. §§ 371, 1001, 1546 and seven counts of aiding and abetting others in making false statements to the INS in violation of 18 U.S.C. §§ 1001 and 2. The issue before the Court of Appeals was whether the district court erred in instructing the jury that Sarantos could be found guilty of abetting and making false statements if the jury concluded that " 'he knew ... [the statements] were false and that he wilfully and knowingly participated in furthering the conduct.' " *Sarantos,* 455 F.2d at 880.

The evidence at trial showed that Sarantos was involved with a scheme along with his codefendant Constantine Makris to obtain permanent residences in this country for male Greek aliens. Makris helped locate Puerto Rican women who were interested in marrying Greek aliens in return for a fee and actually helped arrange the sham marriages. Shortly after the marriage ceremony had occurred, the parties visited Sarantos' office. There, the wife would sign a VISA petition [I–130] in blank which Sarantos would later complete and file with the INS. The petitions falsely stated that the parties were living together as husband and wife. The court recounts the evidence of what Sarantos knew or could be charged with knowing as follows:

> Although the government failed to show that Sarantos was ever explicitly told that the couples were not living together, it did furnish abundant evidence that Sarantos was informed of the sham nature of the marriages; in some cases newlyweds required in his presence the aid of an interpreter or sign language because they shared no common language; divorce papers were executed simultaneously with immigration papers; Sarantos was told the wife was being paid a fee; and Sarantos was at least indirectly informed that the parties were not living together.

*Id.* at 880.

On appeal, Sarantos contended that if an attorney is charged with aiding and abetting the making of a false statement by a mere showing of reckless disregard of falsity, the attorney-client relationship would be radically altered as the attorney would be made "an investigative arm of the government." The court stated: "We have not held, as appellant contends, that an attorney must investigate 'the truth of his client's assertions' or risk going to jail.... We have held, and continue to hold that he cannot counsel others to make statements in the face of obvious indications of which he is aware that those assertions are not true." *Id.* at 881.

While it is no doubt true that where an attorney has such obvious indications that his client's assertions are false as was the case in *Sarantos,* it would be improper and perhaps illegal for him to make those representations nonetheless; the facts of the instant case are far different. There is nothing even resembling the type of ongoing scheme that was operating in *Sarantos.* Further, the information the govern-

ment imputes to the petitioners is quite different from that of which Sarantos was aware. Basically, the information the government alleges the petitioners acted in defiance of consists largely of INS' actions on the first I–130 petitions and Golden's suspicions.

 A lawyer is under a professional obligation to "represent a client zealously within the bounds of the law." Model Code of Professional Responsibility, Canon 9 *adopted in* Mass.S.J.C. Rule 3:07. It is fundamentally inconsistent with this obligation to require an attorney to ascertain the truth or falsity of his client's assertions. So long as the attorney does not have obvious indications of the client's fraud or perjury, the attorney is not obligated to undertake an independent determination before advancing his client's position. Disciplinary Rule 7–102(B) of the Code of Professional Responsibility, adopted as a Rule of Massachusetts Courts, makes this clear:

A lawyer who receives information *clearly* establishing that:

(1) His client has, in the course of representation, perpetrated a fraud upon a person or tribunal shall promptly call upon his client to rectify the same, and if his client refuses or is unable to do so, he shall reveal the fraud to the affected person or a tribunal except when the information is protected as a privileged communication.

(emphasis added). To subject a lawyer to the obligation of investigating his client's behavior on less than "clear information" would undoubtedly undermine a client's confidence in his attorney. On the facts presented by the government including the affidavit of Golden, the Court concludes that the government has failed to satisfy its *prima facie* showing of attorney participation in crime or fraud which would enable it to defeat the petitioners' assertion of privileges.

## IV.

 Although the Court has concluded that the subpoenas should be quashed on the basis that the government has failed to satisfy its burden of proving the crime-fraud exception by *prima facie* case, the Court also wishes to briefly indicate that it would quash the subpoena on independent non-privileged grounds as permitted by Fed.R. Crim.P. 17(c) because the subpoenas are unreasonable and oppressive in the context of the ongoing representation of a client before the INS. In *In re Grand Jury Matters, supra,* the First Circuit stressed the importance "that the federal Constitution places upon the right to counsel in criminal prosecutions and the fact that a judge could plausibly determine in these circumstances that the timing of the subpoenas unduly and unnecessarily burden that right." 751 F.2d at 17. Although the instant case does not involve criminal proceedings, it involves immigration proceeding which may lead to deportation. The courts have clearly held that an alien who is charged with deportability is entitled to due process. *Shaughnessy v. Mezei,* 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953); *Navia-Duran v. Immigration & Naturalization Service,* 568 F.2d 803, 808 (1st Cir. 1977). Indeed, "[t]hough deportation is not technically a criminal proceeding, it visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom." *Bridges v. Wixon,* 326 U.S. 135, 154, 65 S.Ct. 1443, 1452, 89 L.Ed. 2103 (1945). Having recognized what is often at stake in immigration proceedings, Congress has expressly required that aliens facing deportation are entitled to representation by counsel. *See* 8 U.S.C. § 1252(b)(2). Clearly, the fact that the instant case involves immigration representation whereas *In re Grand Jury Matters* concerned criminal proceedings does not lessen the relevance of the First Circuit's holding to the instant case. The same facts that were important to the First Circuit in this case are present here; namely, the fact that the Grand Jury investigation was occurring on the very eve of the client's felony trial.

The Court believes that the timing of the grand jury's subpoenas, coming as they do while the petitioners are involved in pending INS proceedings on behalf of their clients, is unreasonable and oppressive.

Fed.R.Crim.P. 17(c). To permit the subpoenas to stand would result in the veritable destruction of the parties' attorney-client relationships. It would also pose a significant chilling effect on the ability of attorneys, especially *pro bono* organizations such as Legal Services Center, to represent their clients zealously within the bounds of the law. *See* Amicus Statement in Support of Legal Services Center's Motion to Quash.

Accordingly, quite apart from any question of privilege, the Court would quash the subpoenas so long as the attorneys are still representing the clients in pending immigration matters. *See In re Grand Jury Matters,* 751 F.2d at 19.[9]

## V.

For the reasons set forth above, the Court concludes:

1) The government has failed to establish the preliminary showing of relevance and need with regard to the Grand Jury's investigation of the clients to authorize the subpoenas in question;

2) While the government has satisfied the preliminary requirement of relevance and need with regard to the investigation of the attorneys' alleged wrongdoing, the Court finds that the petitioners have successfully asserted their attorney-client and work product privileges;

3) The government has failed to establish its *prima facie* showing of crime-fraud exception to these privileges; and

4) Quite apart from the questions of privilege, the subpoenas are, in the present context of ongoing representation by the petitioners of their clients before the INS, unreasonable and oppressive under Rule 17(c).

Accordingly, the Court has ordered that the subpoenas be quashed. An appropriate Order has issued.

9. The government has contended that the question of timing should be considered in quite a different context. Specifically, the government has suggested that once the deportation proceedings are concluded, the clients would be deported immediately and no longer subject to criminal prosecution. The Court notes that the

### SUPPLEMENTAL ORDER

For the reasons set forth in the Court's Memorandum issued this date, the respondent United States is ordered to:

(1) Withdraw the *ex parte* affidavits submitted in connection with the above-captioned case; *or*

(2) Provide a copy of the affidavits to the petitioner and intervening parties in which case the affidavits shall become part of the public file.

Respondent shall notify the Clerk by August 12, 1985 of its decision either to withdraw or disclose the affidavits in question.

It is So Ordered.

United States Attorney and the Immigration & Naturalization Services are fellow agencies within the Department of Justice and can certainly cooperate between them in determining how to proceed on these matters to effectuate both organizations' interests in the individuals.