**In re SEALED CASE.**

**Nos. 84–5388, 84–5389.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 11, 1984.

Decided Feb. 8, 1985.

Mikva, Circuit Judge filed a concurring opinion.

William Gray Schaffer, Washington, D.C., for appellants.

Guy L. Goodwin, Atty., Dept. of Justice, Washington, D.C., of the bar of the Supreme Court of Kansas, pro hac vice, by special leave of court, with whom Joseph E. diGenova, U.S. Atty., Washington, D.C., was on the brief, for appellee.

Before TAMM and MIKVA, Circuit Judges, and MacKINNON, Senior Circuit Judge.

Opinion for the court filed by Circuit Judge TAMM.

Separate concurring opinion filed by Circuit Judge MIKVA.

TAMM, Circuit Judge:

The Synanon Church challenges a district court order compelling its attorneys to appear before the grand jury to answer questions regarding Synanon's alleged violations of federal law. In a memorandum opinion and order issued June 15, 1984, Chief Judge Aubrey E. Robinson of the United States District Court for the District of Columbia held that the attorneys' invocation of the attorney-client privilege to avoid testifying was barred by the crime-fraud exception. Synanon appeals, arguing that 1) the government did not establish the requisite prima facie case of an ongoing crime or fraud sufficiently related to the attorneys' representation to trigger the exception, and 2) even if some disclosure of otherwise privileged communications is required, the district court's order was impermissibly overbroad. For the reasons given below, we affirm the district court's order in all respects.

## I. BACKGROUND

Appellant is an entity that refers to itself as the Synanon Foundation, Inc. or the Synanon Church (Synanon). It was found-

ed as a tax-exempt, non-profit organization in 1958 by Charles Dederich for the purpose of rehabilitating drug addicts and engaging in research and public education.

Over the years, Synanon began to move out of the rehabilitative business and into a variety of more diverse and extremely lucrative investment and commercial enterprises. A large portion of the wealth generated by these activities eventually found its way into the pockets of the Dederich family and other Synanon leaders. As a result of these activities, the Internal Revenue Service (IRS) commenced an audit of Synanon in 1979 to determine whether to revoke its tax-exempt status.

In addition, Synanon began in the 1970's to employ extreme measures to stifle media or other external scrutiny and to silence disaffected members. These measures have included lawsuits and violent attacks directed at media, former members, attorneys involved in litigation against Synanon, or anyone else viewed as an "enemy."

As a result of the IRS audit and the extensive litigation, Synanon's organization and internal policies became increasingly subject to discovery by opposing litigants. In response, and at the direction of Synanon executives and its legal department, Synanon embarked on a massive and systematic program to destroy and alter subpoenaed evidence or evidence sought pursuant to civil discovery requests. Affidavits of two former Synanon members who participated in this program reveal a scheme that worked substantially as follows.

The principal target of the campaign was an extensive library of tape-recorded speeches of Charles Dederich and other key discussions or pronouncements of Synanon officials. Many of the taped speeches revealed violent plots against those whom Dederich viewed as Synanon's enemies. Others discussed the channeling of the charitable foundation's assets into the hands of the Dederich family and other Synanon officials through salaries, bonuses, and other means.

Synanon's archivist, Steve Simon, prepared lists of incriminating subjects and provided them to those involved in listening to and erasing tapes. In addition, Simon would receive information from Synanon's legal department concerning specific materials being sought by opposing litigants. The archivist would collect the pertinent tapes and erase the incriminating materials, relabel them, and burn the original labels. Others were relabeled with innocuous titles to avoid subpoena and document production requests entirely.

Although most of Synanon's litigation in the late 1970's took place in California,[1] Synanon in July 1978 commenced an action in the District of Columbia Superior Court to recover a $250,000 deposit paid in connection with the planned purchase of a building in the District of Columbia. *Synanon Foundation, Inc. v. Bernstein*, No. 7189–78 (D.C.Super.Ct. Oct. 12, 1983) (*Bernstein*). Synanon also sued the IRS in August 1982 in the United States District Court for the District of Columbia seeking a declaratory judgment that the IRS erroneously revoked Synanon's tax-exempt status. *Synanon Church v. United States*, 579 F.Supp. 967 (D.D.C.1984) (the tax case). Attorney John Doe[2] has represented Syna-

---

**1.** The California litigation included, among others, suits against Time, Inc., the American Broadcasting Company, and Paul Morantz, an attorney who had frequently represented parties in suits against Synanon. According to affidavits filed in connection with this case, Synanon officials stated that the purpose of its libel suits against Time, Inc. and ABC was to punish them for unfavorable publicity and to "teach the media not to mess with Synanon." In addition to these major lawsuits, Synanon routinely sued any individual who opposed the organization in any way, including a schoolteacher who wrote a letter to her U.S. Senator complaining about Synanon's activities.

Paul Morantz was a target of violence as well as lawsuits. On October 10, 1978, Mr. Morantz was bitten by a four foot rattlesnake placed in his mailbox by two Synanon "Imperial Marines." Both the "Marines" and Charles Dederich pleaded *nolo contendere* to charges filed in connection with the attack.

**2.** Upon a motion by the attorneys, the district court ordered the record in this case to be sealed, and the parties to be referred to in every

non in both suits since September 1981. Attorney James Roe, a member of Doe's law firm, represented Synanon from July to November of 1983.

In July 1983, the defendant in *Bernstein* moved to dismiss Synanon's complaint on the grounds that Synanon had destroyed relevant evidence. Judge Braman granted the motion. In February 1984, Judge Richey dismissed the complaint in the tax case on grounds that Synanon was collaterally estopped from challenging Judge Braman's prior findings of misconduct and that those findings established a fraud upon the courts.

Information obtained by the government during its audit of Synanon and the ensuing tax case precipitated a grand jury investigation of Synanon for possible violations of 18 U.S.C. § 1505 (1982) (obstruction of justice), 18 U.S.C. § 1001 (1982) (fictitious or fraudulent statements in department or agency matters), 18 U.S.C. § 1503 (1982) (influencing officers or jurors), 18 U.S.C. § 371 (1982) (conspiracy), and 18 U.S.C. § 1962 (1982) (racketeering). On May 17, 1984, the government subpoenaed Doe and Roe to testify before the grand jury regarding Synanon's destruction and alteration of documents and records and perjury by Synanon members in the *Bernstein* and tax cases. Doe and Roe invoked the attorney-client privilege and refused to testify.

The government on May 18, 1984 filed an amended motion to compel testimony based upon the "crime-fraud" exception to the attorney-client privilege. The government alleged in its motion that false declarations, altered documents, and perjured testimony were presented in both courts during the period of representation by Doe and Roe and that false and altered documents were presented in pleadings filed by Doe. In support of that motion, the government submitted five items of evidence: 1) a sworn declaration dated July 8, 1983 by Bette Fleishman, a Synanon member who, at the direction of Synanon executives, participated in the destruction of subpoenaed evidence; 2) a sworn declaration dated September 12, 1983 by George Farnsworth, a former Synanon member who worked on a secret Synanon project to destroy and alter information in Synanon's computer indices of the tape recordings and transcripts contained in the Synanon archives; 3) Superior Court Judge Leonard Braman's October 12, 1983 ruling and opinion in *Bernstein* finding that Synanon had willfully destroyed and altered Synanon audio tapes that had been requested by the defense; 4) a ruling and opinion by United States District Court Judge Charles R. Richey dated February 9, 1984 dismissing the tax case because of Synanon's "willful, systematic, and extensive destruction and alteration of documents and tapes relevant to a determination of Synanon's tax-exempt status"; and 5) an *in camera* submission demonstrating Synanon's continuing concealment of its scheme of evidence destruction and alteration throughout both the *Bernstein* and the tax cases.

The district court found that the government had made a prima facie showing of ongoing crimes and frauds during the period that Doe and Roe represented Synanon and that the crime-fraud exception to the attorney-client privilege therefore applied. Specifically, the court found that "Synanon perpetrated a continuing fraud connected with, but not limited to, the actual destruction of records. The later cover-up was designed to further an ongoing conspiracy to manipulate the process of the courts for Synanon's own ends." The court also found that this fraud necessarily involved the attorneys. The court therefore ordered Doe and Roe to appear before the grand jury and answer questions in connection with the violations. In response to the order, Doe and Roe filed affidavits with the district court stating that they felt compelled by the Code of Professional Respon-

instance by the pseudonyms John Doe and James Roe. The district court based its decision on the need to safeguard the secrecy of this grand jury proceeding and to protect the attor-

neys against disclosures that might reflect adversely on their professional reputations. We see no reason to disturb the district court's order.

sibility to comply with the order of the court and would testify over the objections of their client rather than place themselves in contempt. This appeal by Synanon followed.

## II. Discussion

### A. *Appealability*

 An order in an ongoing proceeding to compel testimony or document production ordinarily is not appealable unless the party to whom it is addressed refuses to respond and is held in contempt. *In re Sealed Case*, 737 F.2d 94, 97 (D.C.Cir.1984) (*Sealed Case III*). In cases where the person subpoenaed is not the holder of a privilege, however, appellate review may be available prior to the execution of the order compelling testimony. *See Perlman v. United States*, 247 U.S. 7, 38 S.Ct. 417, 62 L.Ed. 950 (1918). The *Perlman* exception is based on the rationale that a witness whose privilege is not at stake has no incentive to preserve the privilege by committing contempt of court.

 This court recently held that when circumstances make it unlikely that an attorney would risk a contempt citation in order to allow immediate review of a claim of privilege, the *Perlman* exception will apply. *Sealed Case III*, 737 F.2d at 97. *See also United States v. Nixon*, 418 U.S. 683, 691, 94 S.Ct. 3090, 3099, 41 L.Ed.2d 1039 (1974). Doe and Roe have sworn in affidavits that they will comply with the district court's order and testify over the objections of their clients. We therefore accept immediate appellate review of Synanon's claim of privilege under the *Perlman* exception.

### B. *The Crime-Fraud Exception*

 Communications otherwise protected by the attorney-client privilege are not protected if the communications are made in furtherance of a crime, fraud, or other misconduct. *Clark v. United States*, 289 U.S. 1, 14, 53 S.Ct. 465, 469, 77 L.Ed. 993 (1933); *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d 1032 (2d Cir.1984); *In re Sealed Case*, 676 F.2d 793, 812 (D.C. Cir.1982) (*Sealed Case II*). To overcome a claim of privilege, the government need not prove the existence of a crime or fraud beyond a reasonable doubt. Rather, the government must first make a prima facie showing of a violation sufficiently serious to defeat the privilege,[3] and second, establish some relationship between the communication at issue and the prima facie violation. A prima facie violation is shown if it is established that the client was engaged in or planning a criminal or fraudulent scheme when it sought the advice of counsel to further the scheme. *In re Murphy*, 560 F.2d 326, 337 (8th Cir.1977). *See also Sealed Case II*, 676 F.2d at 814–15. The government satisfies its burden of proof if it offers evidence that if believed by the trier of fact would establish the elements of an ongoing or imminent crime or fraud.[4] *See Sealed Case II*, 676 F.2d at 815. The determination that a prima facie showing has been made lies within the sound discretion of the district court and may be dis-

---

3. At least one court has framed the test in terms of probable cause to believe that a crime or fraud had been committed and that the communications were in furtherance thereof. *See In re John Doe Corp.*, 675 F.2d 482, 491 & n. 7 (2d Cir.1982). As the Second Circuit noted in *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d 1032, 1039 (2d Cir.1984), however, there is little practical difference between the two tests. "Both require that a prudent person have a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud, and that the communications were in furtherance thereof." *Id.*

4. The majority of cases addressing the crime-fraud issue have dealt specifically with the work product privilege. As Judge Wright recognized in *Sealed Case II*, however, "[a]n exception or waiver of the work product privilege will also serve as an exception or waiver of the attorney-client privilege, since the coverage and purposes of the attorney-client privilege are completely subsumed into the work product privilege." 676 F.2d at 812 (footnote omitted). *See also In re Grand Jury Proceedings*, 604 F.2d 798, 803 (3d Cir.1979) (generally, crime-fraud exception applies to the work product as well as attorney-client privilege, and in cases where the two privileges substantially overlap, there is no reason to apply different standards).

turbed on appeal only if the district court abused its discretion. *In re Berkley & Co.*, 629 F.2d 548, 553 (8th Cir.1980); *In re September 1975 Grand Jury Term*, 532 F.2d 734, 737 (10th Cir.1976).

■ The Fleischman and Farnsworth affidavits, based on the personal observations and participation of the affiants, reveal in extraordinary detail a pervasive and systematic scheme to destroy or alter subpoenaed evidence. The affidavits further reveal Synanon's continuing efforts to conceal its wrongdoing before courts in which it was involved in litigation—all with the knowledge and participation of Synanon's legal department. Synanon archivist, Steve Simon, for example, routinely perjured himself in litigation in which Synanon was involved, as did other Synanon officials. The affidavits also show that the computer tape inventory presented by Simon as Exhibit 1 to his November 1981 testimony given in *Bernstein* had been deliberately falsified.

In addition, the government offered Judge Braman's and Judge Richey's orders dismissing the cases before them as further evidence of Synanon's fraudulent misconduct. Judge Braman heard eleven witnesses, received 78 exhibits and an approximately equal number of subexhibits on the charge that Synanon destroyed evidence, concealed its activities by perjury, and committed fraud upon the court. Based on his review of the evidence, including the Fleishman and Farnsworth affidavits, Judge Braman concluded

that the evidence clearly and convincingly establishes a willful, deliberate and purposeful scheme to ... destroy extensive amounts of evidence and discoverable materials which probably would have had a dispositive bearing upon Synanon's complaint....

The scheme further had as its purpose to cover up and conceal this destruction of evidence and discoverable materials by giving false testimony in deposition and before this Court in the hearing before Judge Fauntleroy, and further, to cover up and conceal the destruction by being

disingenuous in the representations before this Court at the January, 1980 hearing before Judge Thompson, and in its responses to the defendants' discovery.

Judge Richey reached a similar conclusion and dismissed the declaratory judgment action with prejudice due to

plaintiff's willful, systematic, and extensive destruction and alteration of documents and tapes relevant to a determination of Synanon's tax-exempt status. This "egregious misconduct" amounts to "a scheme to interfere with the judicial machinery performing the task of impartial adjudication, ... by preventing the opposing counsel from fairly presenting ... [its] case or defense." *Pfizer, Inc. v. International Rectifier Corp.*, 538 F.2d 180, 195 (8th Cir.1976). More than mere fraud between the parties, or an isolated instance of perjury, plaintiff has compounded its "unconscionable plan," *England v. Doyle*, 281 F.2d 304, 309 (9th Cir.1960), by its indisputable misconduct before this court.

Judge Richey further found that "Synanon has continued its misconduct and perpetuated this fraud up to the present"—February 9, 1984.

The *in camera* exhibit provided a further account of the scheme of evidence destruction and the ensuing cover-up in both *Bernstein* and the tax case. In response to Judge Richey's order requiring Synanon to account for the destroyed tapes, for example, Synanon produced as part of a pleading signed by attorney Doe a fraudulent inventory of the Charles E. Dederich tape library. In addition, although Synanon general counsel Philip Bourdette misrepresented and concealed information about Synanon's archive system throughout the IRS audit, he stated in a summary affidavit filed with the court in the tax case that no such concealment or misrepresentation had ever taken place.

Synanon argues that these allegations of misconduct do not rise to the level of seriousness contemplated by the court in *Sealed Case II*, and therefore invocation of

the exception is unwarranted. Synanon makes the astonishing assertion that the alleged wrongdoing—perjured testimony, document destruction, and similar misconduct—constitutes mere discovery abuse for which Synanon has been adequately punished by dismissal of its two lawsuits. Such a characterization seems disingenuous: the grand jury's investigation into Synanon's scheme of evidence destruction and concealment thereof involves possible *federal crimes*, not mere frauds between private litigants.[5] Indeed, that perjury and obstruction of justice constitute "serious" misconduct strikes us as a relatively uncontroversial proposition.

Synanon claims, however, that the impact of its abuses on the adversary system "is of far less significance" than cases in which the misconduct "goes to the heart of the adversary system," such as attempted bribery of a judge or corruption of jurors. The magnitude of the scheme of destruction and ensuing cover-up, however, belies this assertion. Synanon's attempt to emasculate the court's ability to ascertain the truth necessarily strikes at the very foundations of the adversary system and the judicial process. Indeed, the judicial process itself was a central target and tool of the alleged criminal and fraudulent activity at issue in this case.

In attempting to balance the important policies underlying the attorney-client privilege with those that would remove the priv-

ilege when it is abused, courts sometimes are required to draw fine lines in close cases. This case, however, is not one of them. The evidence relied on by the district court was more than circumstantial: it included actual findings of fact by courts of competent jurisdiction that Synanon had committed an ongoing fraud in litigation in which it was represented by Doe and Roe. In addition, the Fleishman and Farnsworth affidavits supported, and the in camera exhibit corroborated, the findings in every particular. Clearly, the district court correctly found that the government had sustained its burden in establishing a prima facie case of a violation sufficiently serious to defeat the privilege.

Synanon argues, however, that "mere coincidence in time between alleged acts of misconduct and the period of representation, without more" is insufficient to meet this burden, and that such a coincidence was all that was shown in this case. It also claims that there has been no prima facie showing of Synanon's intent in consulting Doe and Roe and that such a showing is required in order to demonstrate that the representation was sought "in furtherance" of a crime or fraud. Synanon emphasizes that there is no contention or evidence that Doe or Roe were actually involved in the ongoing fraud and that Synanon's purpose in retaining the attorneys was for the prosecution of legitimate civil lawsuits.

---

**5.** Synanon's attempt to minimize the seriousness of its misconduct by characterizing it as incidental discovery abuse is inapposite. Misuse and abuse of the discovery process by litigants has been a matter of increasing concern to courts generally, and the deleterious effect on the judicial system cannot be overemphasized. *See generally* Renfrew, *Discovery Sanctions: A Judicial Perspective*, 67 CALIF.L.REV. 264 (1979); *Addresses Delivered at the National Conference on the Causes of Popular Dissatisfaction with the Administration of Justice*, 70 F.R.D. 79 (1976); ABA Litigation Section, *Report of the Special Committee for the Study of Discovery Abuse* (1977). Since the Supreme Court's decision in *National Hockey League v. Metropolitan Hockey Club*, 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976), approving the imposition of severe sanctions in order to punish and deter such abuse, courts have increasingly been willing harshly to

penalize litigants and lawyers who abuse the discovery process, particularly where the misconduct is as egregious as here. *See, e.g., Litton Systems, Inc. v. American Tel. & Tel. Co.*, 700 F.2d 785 (2d Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984) (affirming district court's denial of costs and attorney's fees to which plaintiff otherwise would have been entitled as a matter of law where plaintiff's attorneys intentionally concealed evidence); *General Atomic Co. v. Exxon Nuclear Co., Inc.*, 90 F.R.D. 290 (S.D.Cal.1981) (imposing sanctions upon party whose inability to produce requested documents was attributed to a deliberate strategy of concealment of evidence in anticipation of antitrust litigation). *See generally* E. Epstein, C. Corcoran, F. Kneger, W. Carr, *An Up-Date on Rule 37 Sanctions After National Hockey League v. Metropolitan Hockey Clubs, Inc.*, 84 F.R.D. 145 (1979).

■ Doe and Roe's knowledge of the cover-up, however, need not be established in order for the government to sustain its burden. It is well settled that an attorney's ignorance of his client's misconduct will not shelter that client from the consequences of his own wrongdoing.[6] Regardless of whether Doe and Roe knowingly participated in the cover-up, the evidence amply supports a reasonable inference that their representation and advice in both suits assisted Synanon in carrying out its illegal and fraudulent scheme.

■ The government also is not required to make a specific showing of the client's intent in consulting the attorney, especially in a case, like this one, in which the attorneys essentially served as "front men" in a scheme to subvert the judicial process itself.[7] Although we agree that "mere coincidence in time," without more, cannot support the invocation of the exception, the evidence presented to the district court clearly demonstrates more than just simple coincidence. Doe and Roe represented Synanon in litigation in which the most highly probative evidence had been destroyed and the destruction itself was the subject of an ongoing cover-up. Perjured testimony was given, and Doe and Roe were used to file and verify the authenticity of false documents. Doe and Roe thus were instrumentalities in the ongoing cover-up whether they realized it or not, and the fact that their primary role was the prosecution of legitimate lawsuits cannot whitewash Synanon's ancillary use of the attorneys to assist in its fraudulent scheme. We therefore conclude that the

district court applied the correct legal standard and properly found that the crime-fraud exception barred invocation of the attorney-client privilege.

## C. The Breadth of the Exception

■ Clearly, the crime-fraud exception will defeat the attorney-client privilege only as to misconduct that occurred during the period of representation by Doe and Roe. Communications with Doe and Roe regarding past crimes, including misconduct that occurred during the California litigation, remain privileged. To the limited extent that past acts of misconduct were the *subject* of the cover-up that occurred during the period of representation, however, then past violations properly may be a subject of grand jury inquiry.

■ Synanon argues that the district court's order that Doe and Roe appear before the grand jury and answer "any questions which the grand jury may ask in connection with the alleged violations" is impermissibly broad. Synanon further argues that because the district court did not review any question the government asked or proposed to ask, it failed to make the requisite findings as to whether the privileged communications at issue reasonably related to the alleged crime or fraud.

We see no reason, however, to remand this case for clarification of the scope of the order. When the district court's opinion is read as a whole, the term "alleged violations" necessarily refers to violations that occurred during the time in which Doe and Roe represented Synanon. The

6. "[A] guilty client may not use the innocence or ignorance of its attorney to claim the court's protection against a grand jury subpoena." *Sealed Case II,* 676 F.2d at 812. *See also In re Grand Jury Subpoena Duces Tecum,* 731 F.2d at 1038; *United States v. Hodge and Zweig,* 548 F.2d 1347, 1354 (9th Cir.1977).

7. Synanon in effect is arguing that we place a greater burden on the government. To require a more specific showing of intent, however, would lead to either the kind of "minitrial" forbidden by the Supreme Court in *United States v. Dionisio,* 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973), or a near evisceration of the

exception. *Sealed Case II,* 676 F.2d at 815. In support of its argument, Synanon cites *In re International Systems and Controls Corp. Securities Litigation,* 693 F.2d 1235, 1243 (5th Cir. 1982). In *International Systems,* the Fifth Circuit held that a showing of specific intent would be required before the disclosure of certain company documents otherwise protected by the work product privilege would be compelled. Unlike the present case, however, the movants in *International Systems* had made only *allegations* in support of its prima facie case; they had offered no other evidence. 693 F.2d at 1242.

government concedes that the order applies only to instances of fraud, perjury, and false document submission that transpired during the period of representation and not to prior acts or confessions beyond the scope of the continuing fraud. Such prior acts unquestionably remain within the protection of the attorney-client privilege.

Judge Robinson indicated in the transcript of the hearing of May 18, 1984 that he was prepared to rule on the propriety of each question on a question-by-question basis. This permits the court to make the requisite relatedness finding for each question to which counsel objects and is precisely the relief Synanon requested in its brief. In addition, given the nebulous distinction in this case between prior acts that remain protected by the attorney-client privilege and prior acts forming the basis of the ongoing cover-up that do not, we believe a question-by-question determination is not only appropriate but required by the circumstances. We therefore find that the scope of the order is not impermissibly overbroad.

For the foregoing reasons, the district court's order is

*Affirmed.*

MIKVA, Circuit Judge, concurring:

I join in the court's decision but wish to stress the limits of our holding. The subpoenas we sustain today are directed solely against attorneys who represented their client in civil litigation; we thus do not decide whether communications between a criminal defense attorney and his or her client would be made unprivileged by a showing of client misconduct comparable to the one made here. In my view, the Sixth Amendment and the underlying policies of the common law privilege require heightened protection of confidential communications between lawyer and client when the lawyer is defending the client against criminal charges. In addition I note that the discussion of the crime-fraud exception in *In re Sealed Case*, 676 F.2d 793, 812–16 (D.C.Cir.1982) (*Sealed Case II*), expresses the views of the author of the opinion but does not speak for the court. *See id.* at 797, 825.