Brigitte DUTTLE, as Executrix of the Estate of Norbert Duttle, Diethelm Goelkel, Christolph Hoeltzel, Horst Weidl, Paul Hoffman, and Intact G.m.b.H., Plaintiffs,

v.

BANDLER & KASS, a New York Partnership, Robert Sylvor, William Werner, and Tim Johnson, Defendants.

No. 82 Civ. 5084 (KMW).

United States District Court, S.D. New York.

July 6, 1989.

Herbert C. Ross, Oppenheimer Wolff & Donnelly, New York City, Russell Piccoli, Phoenix, Ariz., for plaintiffs.

Neal Schwarzfeld, Schwarzfeld, Ganfer & Shore, New York City, for defendants Bandler & Kass and Robert Sylvor.

## MEMORANDUM AND ORDER

JAMES C. FRANCIS, IV, United States Magistrate.

This is an action involving alleged violations of section 17 of the Securities Act of 1933, 15 U.S.C. § 77q, section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*, and state law. The plaintiffs are five West German citizens who purchased the securities of four United States issuers in 1979 and 1980. They allege that representations made to them by the defendants in connection with the purchase of the securities were false and misleading. Two issues are now before the Court. First, the defen-

dants seek to preclude the admission at trial of the deposition of Klaus Tueckmantel. Defendants' counsel was not present when Mr. Tueckmantel was deposed, and this witness has since died. Second, the defendants seek production of numerous documents as to which the plaintiffs have asserted the attorney-client privilege.

*Background*

According to the complaint, the frauds at issue here had their origin in May, 1979, when Earl Belle met with Peter Knuebel and Alfred Boehme in West Germany. Belle, accompanied by defendant Robert Sylvor, a partner in the law firm of Bandler & Kass, represented himself to be a financier and an investment advisor for European Commercial Finance and Fiduciary, Ltd. ("ECFF"), an offshore bank. He stated that he was authorized to market in Europe large blocks of stock that ECFF controlled, and to do so he wished to organize a securities brokerage firm in West Germany. Knuebel and Boehme agreed to participate in this venture, and in July, 1979, they formed Intact G.m.b.H. ("Intact"), in which they each held a half interest.

Intact then sold shares in Teletrans Industries, Inc. to a number of West Germans, including some of the plaintiffs. Belle provided Intact with information to be relayed to prospective purchasers, including representations that Teletrans owned and operated a string of boutiques in Paris, Biarritz, and New York and that it controlled three companies involved in the development of energy-related products. According to the complaint, these and other representations made about Teletrans were false.

The complaint further alleges that Intact sold stocks and bonds of Space & Energy Conservation Corporation ("SECC") in Europe. In connection with the sale of these securities, investors were told that SECC was a growing company that had contracted to purchase a manufacturer of geodesic domes and was planning a solar energy housing development in Arizona. In fact, these representations, along with others set forth in the complaint, were false: SECC was a shell corporation with no as-

sets or operations and no enforceable contract to purchase any operating company.

The defendants are also alleged to have marketed the stock of International Basic Energy Corporation ("IBEC") through Intact. The sellers represented that IBEC was in the process of acquiring land in Arizona and already owned substantial numbers of shares of Teletrans, SECC, and European Energy Corporation. Again, these statements are alleged to be misleading because no land was purchased and because the shares of the other companies were themselves worthless.

Finally, the defendants sold shares of European Energy Corporation ("EEC") through Intact. It was represented to investors that EEC would market an energy efficient solar and heat-pump system and that it had an exclusive distributorship agreement with a Colorado company to market solar energy products in Europe. But no such agreement existed, and EEC had no assets or income.

The parties are generally in agreement that Earl Belle was the prime culprit in the fraudulent activity that took place. The plaintiffs, however, allege that the law firm of Bandler & Kass and two of its partners, Robert Sylvor and William Werner, aided and abetted Belle by helping him win the confidence both of Intact and of the ultimate investors. By contrast, the defendants argue that any substantial assistance to Belle was provided not by them, but by Intact and its officers. Indeed, Knuebel and Boehme were convicted of fraud in West Germany for their role in Intact. *See* Ex. S to Supplemental Declaration of Neal Schwarzfeld dated April 26, 1989; Deposition of Peter Knuebel at 49–50.

Additional facts will be discussed in connection with the two issues under consideration.

*Discussion*

A. *The Tueckmantel Deposition*

Klaus Tueckmantel was a banker employed by ECFF, the entity controlled by Earl Belle which held the Teletrans stock. Deposition of Klaus Tueckmantel at 2; Knuebel dep. at 91–92. Tueckmantel was involved both in Belle's initial efforts to establish a structure for marketing the stock in Europe and later in the training of Intact brokers who actually sold shares to the public. Tueckmantel dep. at 4–7; Knuebel dep. at 142–43, 219.

Because of Tueckmantel's contacts with the defendants in this case, the plaintiffs anticipated that he could provide relevant testimony. However, because of a heart condition that prevented him from flying, counsel understood that he was unlikely to be available to appear at trial. Tueckmantel dep. at 1–2, 34. Accordingly, plaintiffs' counsel sought to preserve his testimony by taking his deposition, and the Court directed that his deposition and that of other German witnesses who were not parties should proceed in Germany. When plaintiffs' counsel noticed the deposition for dates inconvenient to defendants' counsel, the defendants' attorney sought a protective order requiring the depositions to be rescheduled. The Court denied this motion. Memorandum Endorsement dated August 3, 1988. When defendants' counsel again reiterated that the designated dates were inconvenient, the Court directed counsel to agree on mutually convenient dates. This proved impossible.

Plaintiff's counsel then took Tueckmantel's deposition on the date noticed, August 15, 1988. Defendants' counsel did not attend. Nevertheless, at the end of the deposition, plaintiffs' counsel noted that the witness might be subject to examination by defendants' counsel in the future. Tueckmantel dep. at 34. Furthermore, plaintiffs' counsel promptly sent defendants' counsel a videotape of the deposition and suggested that cross-examination could be conducted by telephone. Although defendants' attorney had represented that he was available after September 6, 1988 to take depositions in West Germany, he never made arrangements to cross-examine Tueckmantel in person or by telephone. *See* Ex. Q to Schwarzfeld supp. dec. Tueckmantel died in January, 1989, forever foreclosing either possibility.

The defendants now move to preclude the admission of the Tueckmantel deposi-

tion at trial, arguing that they will be prejudiced by their inability to subject his testimony to the rigors of cross-examination. The plaintiffs respond that any such prejudice is outweighed by the harm they would suffer if prevented from introducing Tueckmantel's deposition testimony at all. They further suggest that the prejudice to the defendants can be minimized by stipulating to certain facts that might have been elicited in cross-examination.

Pursuant to Rules 32(a)(1) and 32(a)(3)(A) of the Federal Rules of Civil Procedure, the deposition of a witness who has died may be used at trial for any purpose against any party "who was present or represented at the taking of the deposition or who had reasonable notice." In *F.A.A. v. Landy*, 705 F.2d 624 (2d Cir.), *cert. denied*, 464 U.S. 895, 104 S.Ct. 243, 78 L.Ed.2d 232 (1983), the Second Circuit held that a deposition taken by the plaintiff was properly admitted at trial even though the defendant received only four days' notice and did not attend. *Id.* at 634–35. Although the defendant had moved for an order vacating the notice, no decision was rendered prior to the deposition, and the defendant was therefore deemed to have assumed the risk of failing to cross-examine. *Id.*

The same reasoning applies with at least equal force here, since the initial effort of defendants' counsel to change the date of the Tueckmantel deposition had been rebuffed by the Court. *See also Klein v. Tabatchnick*, 459 F.Supp. 707, 712 (S.D.N.Y.1978) (party that received notice but failed to attend deposition could not object to admissibility of transcript). Moreover, defendants' counsel had ample opportunity to cure any problems resulting from the inconvenient scheduling of the deposition by arranging for cross-examination at some later time. *See Shanker v. Helsby*, 515 F.Supp. 871, 873 n. 4 (S.D.N.Y.1981), *aff'd*, 676 F.2d 31 (2d Cir.1982) (lack of notice no bar to admissibility of deposition where objecting party had opportunity to cure by scheduling cross-examination). Thus, the defendants cannot now complain of the scheduling of the Tueckmantel deposition.

Even with adequate notice, however, the courts retain discretion to preclude the admission of deposition transcripts. *See Bobb v. Modern Products, Inc.*, 648 F.2d 1051, 1055 (5th Cir.1981). This is at least in part attributable to the preference for live testimony and for subjecting the witness to the crucible of cross-examination. *See United States v. De Sisto*, 329 F.2d 929, 934 (2d Cir.), *cert. denied*, 377 U.S. 979, 84 S.Ct. 1885, 12 L.Ed.2d 747 (1964); *Nash v. Heckler*, 108 F.R.D. 376, 377 (W.D.N.Y.1985). Thus, it is necessary to weigh the prejudice suffered by the objecting party if the deposition is admitted against that suffered by the party offering the deposition if it is excluded. *See Bobb v. Modern Products, Inc.*, 648 F.2d at 1055 (deposition excluded; testimony cumulative); *Waterman Steamship Corp. v. Gay Cottons*, 414 F.2d 724, 727–28 (9th Cir.1969) (deposition of deceased witness admitted; cross-examination would not have aided objecting party); *Derewecki v. Pennsylvania RR Co.*, 353 F.2d 436, 442–43 (3d Cir.1965) (deposition admitted as necessary to plaintiff; defendant failed to show need for cross-examination).

■ Here, the harm to the plaintiffs' case would be substantial if Tueckmantel's testimony were excluded. The defendants deny knowing that representations made in connection with the sales of the securities were false, and they further deny providing substantial assistance in the scheme. Accordingly, Tueckmantel's testimony is critical to the plaintiffs to the extent that it deals with the knowledge and participation of Werner or Sylvor.

For example, Tueckmantel testified that Belle, after having been convicted of securities fraud, was presented by Werner as a respected businessman and principal of an offshore bank. Tueckmantel dep. at 8, 28. Similarly, Tueckmantel stated that Sylvor had endorsed Belle as entirely trustworthy, *id.* at 9, and had represented that Bandler & Kass would ensure the legality of all transactions under American and German law. *Id.* at 13. Indeed, Sylvor expressed a desire to be an officer and shareholder in another company involved in the sale of

Teletrans shares in order to oversee the operation. *Id.* at 24–25. Further, Tueckmantel testified that Sylvor brought purportedly fraudulent brochures describing Teletrans and "pink sheets" setting forth the trading prices of the stock to West Germany and that he drafted the contract for the sale of these shares through Intact. *Id.* at 19, 21. Finally, Tueckmantel stated that Sylvor offered an explanation for the fact that Belle's wife, rather than Belle himself, was identified as the principal of the entities that Belle controlled. *Id.* at 29. In some cases, this testimony would corroborate that of Knuebel or Boehme. Only Tueckmantel could testify to other subjects, such as Sylvor's transporting of the Teletrans brochures and "pink sheets". In either event, his testimony is central to the claims against the defendants.

By contrast, to the extent that the defendants have demonstrated any prejudice from their inability to cross-examine Tueckmantel, this can be minimized by stipulating to certain facts that might have been revealed. For example, though the defendants' complain of their inability to discredit Tueckmantel by confronting him with his conviction for fraud, the plaintiffs will stipulate to the admissibility of the judgment of conviction. Similarly, they will agree that Tueckmantel had the same knowledge of the companies whose stock Intact sold as did Knuebel. Next, the defendants would have questioned Tueckmantel's own diligence in learning the facts about Belle, and in this regard the plaintiffs will stipulate that Tueckmantel had twenty years' experience as a banker, had banking experience in the United States, and was familiar with SEC filing and disclosure requirements. In the same vein, the plaintiffs agree that the jury may assume that Tueckmantel visited Belle's offices and that those offices did not appear to be a bank. Finally, the plaintiffs will stipulate that Tueckmantel continued working with Belle in 1980 and 1981 even after he knew of Belle's fraud conviction. Thus, many of the defendants' concerns are fully satisfied by the proposed stipulations.

In other respects, the defendants' prediction of what they would have elicited on cross-examination is unfounded. For example, they suggest that they could have demonstrated that Tueckmantel could easily have learned of Belle's conviction. But this is an issue amenable to objective proof of Belle's notoriety and of the availability of records of his conviction; little could have been gained through cross-examination.

Similarly, although the defendants claim prejudice due to their inability to cross-examine Tueckmantel regarding the use of the "pink sheets," they have offered little to substantiate their expectations. The defendants would like to have inquired about why Tueckmantel relied on telexes from Belle concerning the price of Teletrans instead of insisting on receiving the "pink sheets" or quotes from independent brokers. The implication that the defendants seek to draw is that Tueckmantel knew that Belle was simply fabricating the prices. But short of an improbable scenario in which Tueckmantel simply admitted that he was Belle's co-conspirator, the best the defendants could expect would be the revelation of facts from which such an inference could be teased. The plaintiffs will stipulate that Tueckmantel knew of "pink sheets" in general and knew the price for Teletrans included in the "pink sheet" that Tueckmantel says Sylvor took to West Germany. The jury might or might not conclude from this that Tueckmantel knowingly accepted and passed on fabricated prices, but the defendants could not reasonably expect to have gleaned anything more from cross-examination.

Lastly, the defendants argue that they would have established that Tueckmantel was employed by Belle in 1978. But Tueckmantel testified that he first became associated with Belle in 1979, and it is unlikely that he would simply recant this statement. Tueckmantel dep. at 4. In any event, the plaintiffs have offered to stipulate to an earlier date if presented with evidence to substantiate it.

In summary, then, while the plaintiffs would be severely harmed by the exclusion of the Tueckmantel deposition, the defendants would not be significantly prejudiced

by its admission, together with the stipulations offered by the plaintiffs.[1]  Accordingly, the defendants' application to preclude use of the deposition at trial is denied, and counsel are directed to prepare a set of stipulated facts to be presented to the jury.

### B.  Attorney–Client Privilege

The defendants also move to compel the production of numerous documents as to which the plaintiffs have asserted the attorney-client privilege.  The commonly accepted definition of the privilege was articulated by Judge Wyzanski in *United States v. United Shoe Machinery Corp.*, 89 F.Supp. 357, 358–59 (D.Mass.1950):

> The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

I have reviewed *in camera* the sixty-seven documents at issue.  Some are not privileged because, while intended to be confidential, they are communications between a client and a professional who is not an attorney.  Others are discoverable because they are not communications made for purposes of obtaining legal advice even though they are communications between attorney and client.  Still other documents reflect legal advice provided in furtherance of fraud and these are excluded from the privilege.  Finally, a few of the documents do qualify as privileged.  Each category will be considered in turn.

### 1.  Communications with Tax Advisors and Notaries

A number of the documents at issue are communications between Intact and its tax advisors or notaries.  Despite the fact that such persons are not members of the bar, the plaintiffs contend that these communications are privileged under the law of West Germany, and they have submitted the affidavit of an expert in German law attesting to that fact.  *See* Affidavit of Ernst Meyer dated April 21, 1989.  The plaintiffs argue that in the interests of comity, this German privilege should be applied here, and they cite cases where courts have recognized a privilege for communications with foreign patent agents who are not attorneys.  *See Chubb Integrated Systems v. National Bank of Washington*, 103 F.R.D. 52, 65 (D.D.C. 1984); *Duplan Corp. v. Deering Milliken, Inc.*, 397 F.Supp. 1146, 1169 (D.S.C.1974).

■  I am not persuaded that this is an appropriate case into which to import a foreign privilege.  In federal courts, principles of privilege are defined by Rule 501 of the Federal Rules of Evidence, which reads in pertinent part as follows:

> [T]he privilege of a witness, person, government, State or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.  However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or subdivision thereof shall be determined in accordance with state law.

In this case, the plaintiffs assert federal claims under the securities laws and RICO and state law claims based on pendent and diversity jurisdiction.  Since the evidence sought is relevant to both the federal and state claims, any asserted privileges are governed by federal law.  *See von Bulow*

---

**1.**  In other cases where deposition testimony has been admitted without the opportunity for cross-examination, courts have sometimes issued cautionary instructions to the jury, and such a charge might be considered here.  *See Wright Root Beer Co. v. Dr. Pepper Co.*, 414 F.2d 887, 889 (5th Cir.1969); *Rosenthal v. Peoples Cab Co.*, 26 F.R.D. 116, 118 (W.D.Pa.1960).

by *Auersperg v. von Bulow*, 811 F.2d 136, 141 (2d Cir.), *cert. denied*, 481 U.S. 1015, 107 S.Ct. 1891, 95 L.Ed.2d 498 (1987).

There is no doubt that the federal common law limits the attorney-client privilege to communications between the client and a member of the bar or that attorney's agent. *See Status Time Corp. v. Sharp Electronics Corp.*, 95 F.R.D. 27, 32–33 (S.D.N.Y.1982); *Application of John Doe*, 464 F.Supp. 757, 758 (S.D.N.Y.1979). No privilege exists under federal law for communications between a client and a tax advisor or a notary public.

Moreover, considerations of comity do not counsel expansion of the privilege in this case. In general, "testimonial exclusionary rules and privileges are not favored" because they inhibit the truth-seeking process. *von Bulow by Auersperg v. von Bulow*, 811 F.2d at 141. In this case it would be particularly anomalous to allow foreign plaintiffs to utilize the federal courts and at the same time deprive the fact-finder of information on the basis of a privilege not recognized under federal common law.

Finally, the plaintiffs' reliance on the foreign patent agent cases is unavailing. First, as the court recognized in *Status Time Corp. v. Sharp Electronics Corp.*, the role of a patent agent may be unique. 95 F.R.D. at 32. Second, I am persuaded by the court's reasoning in *Status Time* that, in any event, the federal common law ought not recognize a privilege for communications with patent agents. *Id.* at 33. Third, the role of the tax advisors and notaries in this case is more akin to that of an accountant, and communications with an accountant are not privileged unless he is acting as a virtual appendage of an attorney. *See In re Horowitz*, 482 F.2d 72, 81 (2d Cir.), *cert. denied*, 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973); *United States v. Kovel*, 296 F.2d 918, 921 (2d Cir. 1961). Since there is no evidence of such a relationship here, the communications at issue are not privileged, and the plaintiffs shall produce documents no. 2, 4, 7, 11, 12, 13, 24, 41, 42, 51, and 62.

2. *Other Non–Privileged Documents*

■ Other documents withheld by the plaintiffs are not within the scope of the attorney-client privilege because they were not communications between a lawyer and client concerning legal advice. For example, some documents consist of notes of meetings of Intact personnel where various issues were discussed. Although no attorney was present at these meetings, it was evident that legal advice would later be sought concerning the issues discussed. But discussions that anticipate a privileged communication are not themselves privileged. To hold otherwise would expand the attorney-client privilege without limit, since countless communications within an organization could be considered preparatory to seeking legal advice. Accordingly, documents no. 5, 9, and 25 shall be produced. Likewise, the mere presence of an attorney at a meeting does not render the notes of the discussion privileged unless they reflect communications made to obtain his advice. Documents no. 37 and 46 are of this type and must be produced.

■ Next, there are several documents that consist of communications between Intact and its attorneys that merely convey preexisting documents and do not reflect the provision of legal advice. The preexisting documents are not privileged, *see Fisher v. United States*, 425 U.S. 391, 403–04, 96 S.Ct. 1569, 1577–78, 48 L.Ed.2d 39 (1976), and the transmittal letters do not contain confidential communications. Thus, documents no. 8, 16, 17, and 55 must be disclosed.

■ Attorneys' bills and communications regarding retainer agreements are not privileged. *See In re Grand Jury Subpoena Served Upon Doe*, 781 F.2d 238, 247–48 (2d Cir.) (en banc), *cert. denied*, 475 U.S. 1108, 106 S.Ct. 1515, 89 L.Ed.2d 914 (1986); *In re Shargel*, 742 F.2d 61, 62–63 (2d Cir. 1984). Here, the documents that fall into this category, no. 10, 14, 28, 29 and 50, do not disclose otherwise confidential communications and shall be produced. Document no. 57 concerns the termination of the attorney-client relation between Intact and

one of its lawyers, and for the same reasons it too must be disclosed.

### 3. *The Crime/Fraud Exception*

Communications that would otherwise be protected from disclosure by the attorney-client privilege are not protected if they relate to communications in furtherance of a crime or fraud. *See In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d 1032, 1038 (2d Cir.1984). The litigant seeking disclosure need only show that there is probable cause to believe that this exception applies. *See In re Grand Jury Subpoenas Duces Tecum*, 798 F.2d 32, 34 (2d Cir.1986); *In re John Doe Corp.*, 675 F.2d 482, 491 & n. 7 (2d Cir. 1982). This burden will be satisfied if "a prudent person [has] a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud, and that the communications were in furtherance thereof." *In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d at 1039.

There are several corollaries to this general rule. First, the fraud or crime need not have been successfully completed for the exception to apply; rather, communications made in connection with merely contemplated fraudulent or criminal activity must be disclosed. *See id.* at 1038–39. Furthermore, legal advice rendered in support of efforts to cover-up a crime or fraud is not privileged. *See In re Grand Jury Subpoenas Duces Tecum*, 798 F.2d at 34; *In re Sealed Case*, 754 F.2d 395, 401 (D.C. Cir.1985); *In re John Doe Corp.*, 675 F.2d at 491. On the other hand, when fraudulent or criminal conduct is no longer ongoing, communications related to legitimate attempts to provide legal defense to the alleged perpetrators are immune from discovery: "communications with respect to advice as to past or completed frauds are within the privilege." *In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d at 1041. Finally, the intent of the attorney is irrelevant; a communication relating to advice innocently provided by a lawyer loses its privileged status if used by the client in furtherance of crime or fraud. *See In re Grand Jury*

*Proceedings*, 604 F.2d 798, 802 (3d Cir. 1979); *United States v. Loften*, 518 F.Supp. 839, 848 (S.D.N.Y.1981).

The instant case raises novel issues concerning the necessary nexus between attorney-client communications and the fraud that they are purportedly "in furtherance of." The defendants argue that the only business of Intact was the sale of shares in Teletrans, SECC, IBEC, and EEC; *see* Knuebel dep. at 118, and that all these transactions were fraudulent. Thus, according to the defendants, every communication by Intact with its attorneys, on any subject whatever, was in furtherance of fraud.

By contrast, the plaintiffs contend that Intact was an innocent party, duped, as were the plaintiffs themselves, by Earl Belle. Accordingly, they argue that even if Belle committed fraudulent acts, there is no evidence that Intact's consultations with its attorneys were in furtherance of that fraud.

The plaintiffs' argument is flawed in two respects. First, there is substantial evidence that Intact's principals, Peter Knuebel and Alfred Boehme, knew of the fraudulent nature of the transactions for much of the period during which the scheme was perpetrated. Most of the documents fall within the crime/fraud exception on this basis alone. Second, as a legal matter the purported innocence of Intact's personnel is irrelevant as long as the legal advice they were seeking was nevertheless advancing the fraudulent activity.

█ Both Knuebel and Boehme were convicted of fraud in connection with Intact's activities. According to Knuebel's judgment of conviction, Intact sold shares in SECC, IBEC, and EEC through its salesmen. These salesmen passed along "information" obtained from Belle through telephone solicitations, promotional literature, and advertisements. Ex. S to Schwarzfeld supp. dec. at pp. 16–19 (unnumbered). Yet,

the defendant [Knuebel] was able to see, as of February 1, 1980 at the latest, that customers could be damaged if the sale of the securities continued because of the

possibility that the securities were worthless and because Belle put the money of the customers which Intact remitted into his own pocket.

*Id.* at 24. Communications between Intact and its counsel regarding the operation of its sales staff after February 1, 1980 are therefore beyond the privilege, since the salesmen were being used as instrumentalities of the fraud. Accordingly, documents no. 6, 26, 47, and 63 as well as the portion of 31 pertinent to sales agents must be produced.

Similarly, communications with counsel after February 1, 1980 concerning the acquisition of licenses necessary to continue trading securities are not privileged. Advice used to obtain such licenses advanced the fraudulent activity, just as advice used to acquire a pistol permit could further an assaultive crime. Documents no. 32, 33, 34, 58, 59, 60, and 61 are therefore not privileged.

■ Next, efforts to prevent customers and law enforcement agencies from learning of the ongoing scheme are excepted from the privilege. Documents related to cover-up activities here fall into several categories. In testimony that Boehme gave when he was under investigation, he stated that, "[w]hen I realized that the thing could no longer be all right I gave up my managerial position, stating an illness as reason." Ex. N to Schwarzfeld supp. dec. at p. 3 (unnumbered). Thus, once Boehme recognized the illegality of the scheme, legal advice to Intact related to extricating him served to shield him and the company from further inquiry. Documents no. 19, 35, 36, 65, 66, and 67 fall into this category and must be disclosed.

The defendants argue that the sale of land in Arizona to Intact's investors was a fraudulent scheme in itself, exposing related documents to discovery. But such a finding is unnecessary at this stage because those sales furthered the cover-up of the securities scheme. In the summer of 1980, Knuebel and Belle formed a company to buy land in Scottsdale, Arizona and resell it to Intact's investors. "In doing so, the customers were allowed to make 30%

of their contribution in EEC, IBEC and SECC securities; the balance they had to pay. In this manner, Knuebel tried to provide indemnity for the losses of the Intact customers." Ex. S to Schwarzfeld supp. dec. at 24–25. The land scheme thus served two purposes in camouflaging the securities fraud: it "laundered" the worthless stock, removing it from circulation, and it pacified investors by purportedly providing them with a tangible investment. *See* Knuebel dep. at 63–79. Accordingly, the documents related to the land sales, no. 18, 20, 21, 30, and 64, and the remaining portion of 31, must be produced.

■ Communications concerning litigation designed to defend Intact against charges of fraud would normally be privileged. However, when those communications are themselves used to subvert the judicial process, the privilege is lost. *See In re Sealed Case,* 754 F.2d at 400–01 (destruction of documents in litigation furthers fraud). Here, documents no. 52, 53, and 54 reflect an effort by Intact to pay off an adversary in civil litigation in return for an agreement that the settling party withdraw allegations of criminal fraud that had been made or were about to be made to a prosecutor. Such an agreement would both perpetuate the fraud and obstruct justice, and the related communications are therefore not privileged.

Documents concerning the termination of two employees are also germane to efforts to avoid discovery of the scheme. Although these employees appear to have been sales agents, simple personnel matters might not be considered as furthering the fraud. But in this case, the salesmen were terminated precisely because they circulated to customers a telex that suggested that the securities being sold by Intact were worthless. Actions taken in retaliation thus furthered the cover-up, and related communications are not privileged. Documents no. 3, 38, 39, and 40 and paragraphs 1 and 2 of document no. 15 must therefore be produced.

■ The same reasoning applies to an apparently abortive internal investigation by Intact.

Use of the fact of an investigation to allay the concerns of third parties about possible criminal acts, to create the appearance of compliance with laws requiring disclosure, or to cover up a crime disclosed through a protected communication in the course of an investigation will cause the corporation to lose the privilege.

*In re John Doe Corp.,* 675 F.2d at 492. Document no. 27 relates to plans for such an investigation and so must be disclosed.

■ Communications regarding the planning of a fraud are not privileged even if the scheme never comes to fruition. *In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983,* 731 F.2d at 1039. Document no. 43 is a draft telex dated July 15, 1980, concerning a proposed project to be jointly operated by Intact and ECFF, Belle's company. As stated in the Knuebel judgment of conviction, Intact could have had no illusions about Belle by July of 1980, and there is accordingly cause to believe that the proposed venture would have been fraudulent. This document is therefore not privileged.

There is less evidence that, prior to February 1, 1980, Intact was aware of misrepresentations being made concerning the sale of Teletrans stock. Certainly, the stock was being peddled on the basis of false statements. While investors were told that it was a developing conglomerate that owned a string of boutiques and was advancing into the alternative energy field, Third Amended and Supplemental Complaint at ¶ 18, in fact, Teletrans had experienced a loss of $15,000 on sales of just $35,000 in the first seven months of 1978 and had an accumulated deficit of $645,000. Ex. I to Notice of Motion; Knuebel dep. at 220–24. But less evidence has been presented that Intact knew of the falsity of the representations about Teletrans.[2]

Nevertheless, for purposes of the attorney-client privilege, such knowledge is relevant only if application of the crime/fraud exception depends upon whether the client is intentionally involved in fraudulent or criminal activity. The language in some decisions would seem to support such a requirement. For example, in *In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983,* the Court held that "[t]he crime or fraud need not have occurred for the exception to be applicable; it need only have been *the objective of the client's communication.*" 731 F.2d at 1039 (emphasis added). Similarly, in *In re Grand Jury Subpoena Duces Tecum,* the court stated that "[t]he exception applies only when there is probable cause to believe that the communications with counsel were *intended* in some way to facilitate or to conceal the criminal activity." 798 F.2d at 34 (emphasis added). From these cases it might be inferred that if the client's intent is innocent, the communication is necessarily privileged.

But those cases concerned alleged fraud or crime by the client, not a fraud perpetrated through a purportedly innocent intermediary. Thus, the courts in those cases necessarily focused on the client's intent to determine whether there was prima facie evidence of crime or fraud at all. By contrast, the evidence here of Belle's fraud regarding Teletrans is substantial, and the only issue is whether Intact's attorney-client communications remain privileged.[3]

■ The determination of this question turns on the purposes underlying the privilege and the crime/fraud exception.

**2.** Knuebel did admit receiving financial information about Teletrans in May, 1979, but it is not clear whether he understood its significance. Knuebel dep. at 208–10.

**3.** In *In re Sealed Case,* the court stated that the party seeking to penetrate the privilege "is not required to make a specific showing of the client's intent in consulting the attorney...." 754 F.2d at 402. This would seem to support requiring disclosure of attorney-client communications by an innocent intermediary. But again, the court was not addressing this specific problem. Rather, it was concerned with the quantum of proof that a party would have to present in order to trigger the crime/fraud exception. The court in that case proceeded to find that the client's fraudulent intent could be inferred from the surrounding circumstances. *Id.*

The rationale for the exclusion is closely tied to the policies underlying these privileges. Whereas confidentiality of communications and work product facilitates the rendering of sound legal advice, advice in furtherance of a fraudulent or unlawful goal cannot be considered "sound." Rather advice in furtherance of such goals is socially perverse, and the client's communications seeking such advice are not worthy of protection.

*In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d at 1038. By this analysis, legal advice that furthers a fraudulent goal is not privileged, regardless of the innocence of the client seeking the advice. Because the client and his lawyer have become instruments of the fraud, their communications are no longer sacrosanct. Thus, the ultimate perpetrator cannot insulate attorney-client communications used to further his fraud by keeping other participants in ignorance. Accordingly, the documents concerning the sale of Teletrans shares are subject to discovery, and documents no. 22, 23, 44, and 56 [4] shall be produced.

### 4. *Privileged Documents*

There must be a "purposeful nexus" between the communications at issue and the criminal or fraudulent activity in order for the crime/fraud exception to apply. *In re Grand Jury Subpoenas Duces Tecum*, 798 F.2d at 34. Only if the attorney-client communication is "reasonably relate(d)" to the crime or fraud will the privilege be overridden. *In re Sealed Case*, 676 F.2d 793, 815 (D.C.Cir.1982) (work product). *Cf. In re Murphy*, 560 F.2d 326, 339 (3d Cir.1977) ("close relationship" between documents and fraud required). It is not enough that there was merely a temporal coincidence between the fraudulent or criminal activity

and the client's consultation with counsel. *See In re Grand Jury Subpoenas Duces Tecum*, 798 F.2d at 34; *In re Sealed Case*, 754 F.2d at 402. Thus, even a criminal organization engages in some untainted transactions, and communications regarding such activities retain their privileged status.

▪ Therefore, the defendants cannot simply argue that because all of Intact's securities transactions were based on fraud, none of its attorney-client communications may be privileged. Although the "purposeful nexus" standard is imprecise, it is clear that documents closely relating to Intact's sales function, its cover-up of the fraud, and plans to engage in further fraudulent activity fall within the exception. On the other hand, communications relating to corporate operations not directly concerned with the sale of securities cannot be said to have been in furtherance of the fraud.

▪ Thus, advice concerning the purchase of real property (not property to be sold to investors) is privileged, and documents no. 1 and 49 need not be disclosed. Similarly, communications relating to a search of Intact's offices for a prior tenant's files bear no relation to Intact's fraud, and document no. 45 remains privileged. Document 48 and paragraphs 3–5 of document no. 15 concern ongoing litigation, including suits by investors and employee matters. Since there is no evidence that these lawsuits involved efforts to hinder discovery of the fraud, the documents are privileged: those actions brought by investors involve legal advice sought about past fraud, while those concerning personnel issues are not sufficiently related to fraudulent activity.[5]

---

**4.** Document no. 56 concerns the Prometheus Fund, an entity established to sell Teletrans shares. Knuebel dep. at 103. Because this document was created in May of 1980, long after Intact was aware of Belle's fraudulent activities, it would lose the privilege on the basis of Intact's fraudulent intent as well.

**5.** Although the privileged documents were seized at one time by West German authorities,

that seizure did not effect a waiver of the attorney-client privilege. Only a voluntary or perhaps inadvertent disclosure to third parties would constitute a waiver; compelled disclosure does not. *See S.E.C. v. Forma*, 117 F.R.D. 516, 523 (S.D.N.Y.1987); *Teachers Insurance and Annuity Association of America v. Shamrock Broadcasting Co.*, 521 F.Supp. 638, 641–42 (S.D.N.Y.1981).

*Conclusion*

For the reasons set forth above, the deposition of Klaus Tueckmantel shall be admissible at trial, and counsel shall submit a stipulation of those facts to which Tueckmantel would likely have testified had he been subject to cross-examination. The attorney-client privilege is properly asserted as to documents no. 1, 45, 48, and 49, and paragraphs 3–5 of document no. 15. The remaining documents submitted for *in camera* inspection do not qualify for protection and shall be produced by the plaintiffs.

SO ORDERED.